Saboet Elmazi AZIZI and Feim Azizi, Plaintiffs–Appellants,

v.

Richard L. THORNBURGH, Attorney General of the United States, Defendant–Appellee.

No. 832, Docket 89–6222.

United States Court of Appeals, Second Circuit.

Argued Feb. 21, 1990.

Decided July 5, 1990.

Lucas Guttentag, New York City (Judy Rabinovitz, American Civil Liberties Union Immigration Task Force, New York City, Martha Stone, Philip D. Tegeler, Connecticut Civil Liberties Union Foundation, Ryszard S. Mrotek, William J. Anastasi, Hartford, Conn., of counsel), for plaintiffs-appellants.

Peter Schuck, New Haven, Conn., for amici curiae.

David V. Bernal, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., David J. Kline, Asst. Director, Office of Immigration Litigation, Civil Div., U.S. Dept. of Justice, Washington, D.C., Stanley A. Twardy, Jr., U.S. Atty., D. Conn., Nancy Griffin, Asst. U.S. Atty., Hartford, Conn., of counsel), for defendant-appellee.

Before FEINBERG, CARDAMONE and MINER, Circuit Judges.

MINER, Circuit Judge:

Plaintiff-appellant Saboet Azizi ("Mrs. Azizi"), a naturalized citizen of the United States, and her husband, plaintiff-appellant Feim Azizi ("Mr. Azizi"), a citizen of Yugoslavia, appeal from a summary judgment entered in the United States District Court for the District of Connecticut (Nevas, *J.*) on August 4, 1989 rejecting their constitutional challenges to section 5 of the Immigration Marriage Fraud Amendments of 1986 ("IMFA"), 8 U.S.C. §§ 1154(h), 1255(e) (1988). On appeal, the Azizis maintain that the two-year foreign residency requirement imposed by section 5 on an alien spouse who marries a United States citizen during the pendency of a deportation or exclusion

proceeding violates their rights to equal protection and due process. While we are cognizant of the hardships imposed by this legislation upon aliens and their spouses who enter into legitimate marriages during deportation proceedings, we conclude that section 5 is a valid exercise of Congress' plenary power to regulate immigration and naturalization.

### BACKGROUND

Mr. Azizi, a citizen of Yugoslavia, illegally entered the United States on or about February 24, 1986. Thereafter, the Immigration and Naturalization Service ("INS") instituted a deportation proceeding against him by issuing an order to show cause and notice of hearing. On June 10, 1986, Mr. Azizi conceded that his entry was unlawful but applied for political asylum. Prior to a determination on his application for political asylum, Mr. Azizi married Saboet Elmazi, a Yugoslavian native and naturalized citizen of the United States. A hearing was held in January 1987, after which the Immigration Judge denied Mr. Azizi's application for asylum but granted him until July the privilege of departing voluntarily. According to the Azizis, the Immigration Judge advised Mrs. Azizi that her husband's departure could be prevented by filing a petition for "immediate relative" status in his behalf. *See* 8 U.S.C. § 1151(b).

Immediately following the deportation hearing, Mrs. Azizi filed an immigrant visa petition seeking to have Mr. Azizi qualified as an immediate relative. Pursuant to section 5 of the IMFA, an alien who marries a United States citizen during the pendency of deportation proceedings must reside outside the United States for two years before a petition predicated on immediate relative status will be considered by the INS. *Id.* §§ 1154(h), 1255(e). In violation of section 5, the INS accepted the immigrant visa petition and approved it on June 23, 1987. Mr. Azizi did not file an appeal from the January deportation order, believing he was no longer subject to the order. He did not depart from the United States, and the period for voluntary departure expired.

Mr. Azizi was arrested in November 1987 for failure to comply with the deportation order. He moved immediately to reopen his case before the Immigration Judge, but the motion was denied. On December 9, 1987, the Azizis commenced this action in the district court for the purpose of obtaining relief from the deportation order. On the following day, the INS revoked its approval of Mr. Azizi's visa petition on the ground that it was granted in violation of section 5 of the IMFA. The Azizis amended their complaint to challenge the revocation on constitutional grounds. After pretrial proceedings were concluded, plaintiffs moved for summary judgment, and defendant cross-moved for the same relief. The district court granted defendant's cross-motion for summary judgment, *Azizi v. Thornburgh*, 719 F.Supp. 86 (D.Conn.1989), and this appeal ensued.

### DISCUSSION

Every year, thousands of aliens seek immigrant visas to enter the United States. The Immigration and Nationality Act ("INA") imposes numerical quotas on the number of aliens permitted to immigrate to this country. 8 U.S.C. § 1151(a). Immigrant visas are allocated in accordance with a preference system, which limits eligibility to categories prescribed by the INA. *Id.* § 1153(a). However, aliens who fit within the "immediate relative" class are exempt from the numerical quotas. *Id.* § 1151(a), (b). A spouse, child or parent of a United States citizen is considered an immediate relative and may qualify for permanent resident status. *Id.* § 1151(b).

An alien who marries a United States citizen and obtains permanent resident status while no deportation proceeding is pending is permitted to remain in this country on a conditional basis for two years. *Id.* § 1186a(a)(1), (b). If, at the end of the second anniversary of the marriage, the Attorney General determines that the marriage is bona fide, the conditional status is removed. *Id.* § 1186a(c)(1). In contrast, pursuant to section 5 of the IMFA, an alien who marries a United States citizen during the pendency of a deportation proceeding

must reside outside the United States for two years after the marriage. *Id.* § 1154(h). Upon expiration of this two-year period, the alien spouse may seek permanent resident status. *See id.* §§ 1154(h), 1255(e).[1]

### I. Equal Protection

The Azizis contend that section 5 of the IMFA denies them their fourteenth amendment right to equal protection of the laws because it classifies citizens and aliens in a manner that violates the fundamental right to marry. They maintain that, because section 5 infringes on their right to marry, a strict scrutiny analysis must be employed in reviewing the statute. Specifically, the Azizis point to the fact that the two-year foreign residency requirement places an onerous burden on citizen/alien marriages without prior consideration of the validity of those marriages.

■ While we recognize the fundamental nature of the right to marry, we also must consider that "control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Landon v. Plasencia,* 459 U.S. 21, 34, 103 S.Ct. 321, 330, 74 L.Ed.2d 21 (1982). Perhaps in no area is the legislative power "more complete." *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909). Because of Congress' plenary authority, our review of legislation involving matters of immigration and naturalization is limited. *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977). Congressional authority in this area extends to the establishment of alien classifications as a basis for determining immigration eligibility. *See id.* at 794, 97 S.Ct. at 1479; *Kleindienst v. Mandel,* 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972). Such classifications will be upheld against a constitutional challenge if a rational basis exists for their adoption.[2] *See Guan Chow Tok v. INS,* 538 F.2d 36, 38–39 (2d Cir.1976) (per curiam); *accord Anetekhai v. INS,* 876 F.2d 1218, 1224 (5th Cir.1989).

Recognizing Congress' broad power to classify aliens for immigration purposes, the Azizis maintain that section 5 infringes upon the exercise of their fundamental right to marry. In *Fiallo,* the Supreme Court upheld the constitutionality of a section of the INA that excluded illegitimate children and their natural fathers from the preferential status granted the "child" or "parent" of a United States citizen. 430 U.S. at 799–800, 97 S.Ct. at 1481–82. The Court was not persuaded by the appellants' contention that a strict level of scrutiny must be adopted because the classification impinged on fundamental familial relationship rights of citizens and aliens. *Id.* at 794, 97 S.Ct. at 1479. In the same vein, we reject the Azizis' contention that a strict level of scrutiny must be adopted here because section 5 affects their right to marry.

■ The classes created by section 5 derive from the distinction between citizen/alien marriages that occur before and those that occur after commencement of a deportation or exclusion proceeding. While great deference must be accorded Congress' decision to classify aliens in such a manner, the government must demonstrate some legitimate reason for adoption of the

---

**1.** The Azizis now are divorced, according to a letter submitted approximately one month after submission of this appeal. We do not consider that the subsequent divorce has rendered this controversy moot. The challenge here is addressed to the two-year foreign residency period. *See* 8 U.S.C. § 1154(h), 1255(e). If the constitutional challenge to the two-year foreign residency period were sustained, Mr. Azizi would be subject only to the two-year conditional period imposed on aliens who marry prior to the commencement of a deportation proceeding. Faced with termination of his resident status on the basis of the divorce, Mr. Azizi seemingly could apply for a hardship waiver despite the divorce. 8 U.S.C. § 1186a(c)(4).

**2.** Noting the "facially legitimate and bona fide reason" language used by the Supreme Court in *Mandel,* 408 U.S. at 770, 92 S.Ct. at 2585, the government suggests that this mandates a lower level of scrutiny than is required by the rational basis test. We find that no distinction is intended by the descriptive language and therefore conclude that the rational basis test is applicable.

classification. *Francis v. INS*, 532 F.2d 268, 272–73 (2d Cir.1976).

Section 5 is aimed at preventing an alien from circumventing a potential deportation or exclusion order by entering into a sham marriage after receiving notice of the commencement of a deportation or exclusion proceeding. H.R.Rep. No. 906, 99th Cong., 2d Sess. 6, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5978, 5978. In enacting this legislation as a preventive measure, Congress recognized that " 'aliens who are engaged in deportation proceedings are more likely than other aliens to enter into fraudulent marriages in order to avoid being expelled from the country.' " *Almario v. Attorney General*, 872 F.2d 147, 152 (6th Cir.1989) (quoting *Smith v. INS*, 684 F.Supp. 1113, 1117 (D.Mass. 1988)); *Anetekhai*, 876 F.2d at 1222; *cf. Guan Chow Tok*, 538 F.2d at 38–39. Having identified a potential for fraudulent marriages during the pendency of a deportation proceeding, Congress had a rational basis for prescribing a two-year foreign residency period as a prerequisite to permanent resident status. Accordingly, we find that section 5 of the IMFA does not run afoul of the equal protection clause of the fourteenth amendment.

## II. Due Process

The Azizis advance several arguments in support of their contention that section 5 violates their due process rights. They assert that section 5 places an unconstitutional burden on their fundamental right to marry, without affording them the opportunity to substantiate the legitimacy of their marriage. As previously noted, section 5 is a legitimate preventive measure designed to deter fraudulent citizen/alien marriages during the pendency of deportation proceedings. *Almario*, 872 F.2d at 151–52. Obviously, any statute aimed at eradicating fraudulent marriages could not avoid affecting marital relationships. In light of our limited scope of review, we find the Azizis' contention unavailing.

■ Next, the Azizis contend that the absence of a hearing deprives Mrs. Azizi of her property interest in an approved visa

for Mr. Azizi. It is not disputed that, when Congress grants property rights to illegal aliens, the fifth amendment protects against the deprivation of those rights without due process of law. *See Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976); *see also Board of Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). However, the Azizis cannot succeed on their due process challenge, because they do not have an inherent property right in an immigrant visa, and section 5 does not grant them any such property interest. Through the enactment of section 5, Congress conferred immediate relative status only on the class of alien spouses who marry when no deportation or exclusion proceedings are pending. *See Anetekhai*, 876 F.2d at 1223; *Almario*, 872 F.2d at 151–52; *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985); *Diaz*, 426 U.S. at 80, 83, 96 S.Ct. at 1891, 1892. The power to define the class of alien spouses who qualify for immediate relative status is within the plenary authority vested in Congress over matters of immigration and naturalization. Since the Azizis married after commencement of the deportation proceeding, they cannot demonstrate the right to an immigrant visa and therefore they do not have the requisite property interest necessary to prevail on their procedural due process challenge.

■ In addition, the Azizis contend that section 5 creates an irrebuttable presumption that all citizen/alien marriages entered into during the pendency of deportation proceedings are fraudulent and, if the marriage fails within the two-year foreign residency period, that the marriage is deemed to be void *ab initio* for immigration purposes. In rejecting this contention, we agree with the reasoning adopted by the other circuits that have addressed this challenge to section 5 and conclude that there is no irrebuttable presumption, because aliens who enter into marriages during the pendency of deportation proceedings "are not absolutely precluded from obtaining the 'immediate relative' status available to

other aliens," but are only denied consideration of a petition for immediate relative status for two years. *See Escobar v. INS,* No. 89–5037, slip op. at 5–6 (D.C.Cir. Feb. 2, 1990), *withdrawn pending reh'g en banc,* No. 89–5037 [896 F.2d 564] (D.C.Cir. April 25, 1990); *Anetekhai,* 876 F.2d at 1223; *Almario,* 872 F.2d at 152–53. The enactment of section 5 does not represent a congressional determination that all marriages entered into during deportation proceedings are fraudulent. Congress simply implemented a decision to remove any incentive for aliens facing deportation or expulsion to enter into a fraudulent marriage. *See Escobar,* No. 89–5037, slip op. at 5–6; *Anetekhai,* 876 F.2d at 1223; *Almario,* 872 F.2d at 152–53; *cf. Weinberger v. Salfi,* 422 U.S. 749, 777, 95 S.Ct. 2457, 2472, 45 L.Ed.2d 522 (1975) (social security provision denying death benefits to widow or stepchild based on duration of relationship upheld in face of challenge that it created irrebuttable presumption that marriage was fraudulent); *Michael H. v. Gerald D.,* — U.S. —, 109 S.Ct. 2333, 2340–41, 105 L.Ed.2d 91 (1989) (state law presumption that husband of child's mother is child's father does not violate putative father's due process rights).

The Azizis' final due process challenge is grounded on the contention that section 5 does not create a substantive classification but rather an unconstitutional procedure adopted to stem the influx of illegal aliens. By characterizing the IMFA as procedural rather than substantive, they urge us to scrutinize the statute under procedural due process standards. Further, the Azizis reject the position that the deferential *Fiallo* standard is applicable to the due process challenge, contending that the standard applies only to Congress' power to classify aliens and not to an alien's right to a fair procedure when attempting to prove immediate relative status.

A finding that section 5 is a procedural rather than a substantive legislative enactment would require us to determine "whether the procedures meet the essential standard of fairness under the Due Process Clause." *Plasencia,* 459 U.S. at 35, 103 S.Ct. at 330. The Azizis' attempt to invoke the holding of *Plasencia* as support for their position is misplaced. In *Plasencia,* an exclusion hearing was mandated by statute. The Supreme Court's discussion focused on a permanent resident alien's due process challenge to the adequacy of the exclusion hearing. *Id.* at 32–37, 103 S.Ct. at 329–32. Reliance on *Plasencia* is inapposite because section 5 does not grant a statutory entitlement to a hearing.

We are not persuaded by attempts to characterize the statute as procedural. Through the enactment of the IMFA, Congress attempted to achieve a reduction in the incidence of "marriage fraud." H.R. Rep. No. 99–906, 99th Cong., 2d Sess. 6, *reprinted in* 1986 Code Cong. & Admin. News at 5978. Congress determined that "[a]lthough in theory participating in a fraudulent marriage makes an individual liable to both criminal and administrative sanctions, in practice it is very difficult to revoke or rescind an alien's status, deport him, or even locate him or his spouse." *Id.* Section 5 addresses this perceived abuse by creating two distinct classes of alien spouses, those who marry prior to and those who marry after the commencement of deportation proceedings.

■ According to the Azizis, a manifest problem with section 5 is that resourceful individuals may circumvent the two-year foreign residency period in a number of ways. While loopholes may exist in the statutory scheme, the statute is not irrational simply because it is an imperfect solution to the problems Congress intended to eradicate. *See Salfi,* 422 U.S. at 780, 95 S.Ct. at 2474.

Prior to the enactment of the IMFA, aliens qualifying for immediate relative status included all alien spouses. Motivated by the perceived need to deter marriage fraud, section 5 amended the INA to refine the qualifications of those claiming immediate relative status. The definition of "spouse" for purposes of immigration is now limited to those who have married prior to the commencement of a deportation hearing and precludes, for a period of two years, consideration of any alien who marries during the pendency of a proceed-

ing. 8 U.S.C. §§ 1154(h), 1255(e). The position advanced by the Azizis is merely an invitation to expand the substantive categories created by the IMFA. We reject this entreaty. *See Anetekhai,* 876 F.2d at 1223; *Escobar,* No. 89–5037, slip op. at 1 (Wald, Ch.J., dissenting); *see also Almario,* 872 F.2d at 151–52. *Contra Escobar,* No. 89–5037, slip op. at 6. Accordingly, we hold that section 5 is an exercise of Congress' broad power to enact substantive legislation, classifying the groups of aliens who qualify for immediate relative status.[3]

## III. Estoppel

■ The Azizis contend that the government should be estopped from denying immediate relative status to Mr. Azizi, because the Immigration Judge allegedly told them that Mr. Azizi could apply for immediate relative status, and the INS approved the immigrant visa petition. The government avers that we lack jurisdiction to hear this claim because Mr. Azizi failed to exhaust available administrative remedies. We find it unnecessary to pass on the government's contention, because the Azizis' estoppel claim fails as a matter of law. "[T]he government can be estopped where the traditional elements of estoppel and 'affirmative misconduct' are present." *Scime v. Bowen,* 822 F.2d 7, 9 n. 2 (2d Cir.1987) (quoting *Corniel–Rodriguez v. INS,* 532 F.2d 301, 302 (2d Cir.1976)); *see INS v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 283–84, 74 L.Ed.2d 12 (1982) (per curiam). We agree with the district court that the Azizis have alleged only negligent conduct on the part of the INS. In the absence of affirmative misconduct, estoppel may not be invoked against the government.

## CONCLUSION

The district court properly granted summary judgment dismissing appellants' equal protection and due process challenges. As well, it correctly concluded that

the government may not be estopped in the absence of an allegation of affirmative misconduct. Accordingly, we affirm.

CARDAMONE, Circuit Judge, dissenting:

In my view § 5 of the Immigration Marriage Fraud Amendments of 1986 (Immigration Fraud Amendments or the Amendments), 8 U.S.C. §§ 1154(h), 1255(e) (1988), contravenes the due process requirements of the Fifth Amendment. Relying on the Supreme Court's decision in *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), the majority believes that § 5 is entitled to the substantial deference that the Supreme Court has prescribed for Congress' classification of aliens for immigration purposes. While *Fiallo* provides for deference regarding classification of aliens, § 5 does not establish a new substantive "classification." Instead, it sets up a procedure for detecting and deterring attempts by those who would enter into a fraudulent marriage in order to obtain the classification of "spouse" of an American citizen. As a procedural provision, § 5 must therefore satisfy procedural due process standards, which it fails to do. *Fiallo* provides no exception from the traditional requirements of due process for procedural provisions within immigration statutes. Consequently, I must respectfully dissent from the majority's view. My reasons follow.

## DISCUSSION

A. *Immigration Fraud Amendments.* The Immigration and Nationality Act (Act) allows United States citizens to petition the Immigration and Naturalization Service (INS) to have an alien classified as an "immediate relative[ ]." 8 U.S.C. §§ 1151(b), 1154(a)(1) (1988). Section 1151(b) defines "immediate relatives" as "children, spouses, and parents of a citizen of the United States," and states that immediate rela-

---

**3.** Amici, several church-affiliated relief agencies for aliens and immigrants and two United States Representatives, assert that we can avoid the challenge to the constitutionality of section 5 by interpreting it to include an immediate

hearing for deportable, as opposed to excludable, aliens to prove the validity of their marriage. Because we conclude that section 5 is a substantive legislative enactment, we find their argument unavailing.

tives may be admitted without regard to the Act's admission quotas.

The Act also establishes procedures by which an alien must demonstrate that he or she qualifies as an immediate relative. A section entitled "Procedure for granting immigrant status" requires a citizen who claims to have a qualifying relationship with an alien to file a petition with the Attorney General containing whatever information and documentary evidence the Attorney General needs to determine whether the alien meets the requirements for immediate relative status. *See* § 1154(a)(1). The Attorney General then investigates the facts set forth in each petition to determine whether they are true and sufficient to establish immediate relative status. *Id.* at § 1154(b). If the Attorney General determines that the alien is an immediate relative as defined in § 1151(b), the petition is approved and the Secretary of State must grant immediate relative status. *Id.*

In an attempt to prevent and detect fraudulent marriages—those in which an alien has married a citizen solely for the purpose of obtaining immediate relative status—Congress passed the Immigration Fraud Amendments. Section 2 of the Amendments states that an alien spouse of a United States citizen will not immediately receive full permanent resident status if the marriage was entered into within 24 months prior to applying for an immigrant visa, but instead will be granted permanent resident status on a conditional basis for a two-year period. § 1186a(a), (g)(1). During this two-year conditional period, the INS may revoke permanent resident status and deport the alien spouse if it determines that the marriage was entered into fraudulently. *See* § 1186a(b). To remove the conditional status the alien spouse and the citizen spouse must submit jointly a petition within 90 days prior to the second anniversary of the grant of conditional permanent residency. *See* § 1186a(c), (d)(2). The couple must then appear for a personal interview before an INS agent to establish that their marriage is *bona fide*. *Id.*

Section 5 of the Amendments establishes a different procedure for marriages entered into when "administrative or judicial proceedings are pending regarding the alien's right to enter or remain in the United States," § 1255(e)(2). In that case the Attorney General may not approve the visa petition until the alien spouse has resided outside of this country for a two-year period beginning after the date of the marriage. § 1154(h). After the alien spouse has resided two years abroad, the citizen spouse may then petition for permanent resident status, and—since they will necessarily have been married for at least two years—the alien will not be subject to the conditional residency period of § 2. *See* § 1186a(g)(1). Thus, if the petition is found valid, the alien spouse will immediately be entitled to full permanent resident status. Section 5 does not provide for a hearing or afford a couple an opportunity to demonstrate that they have a *bona fide* marriage prior to expulsion or exclusion.

The district court ruled that § 5 "creates the irrebuttable presumption that an alien who marries during deportation or exclusion proceedings has entered into a fraudulent marriage." *Azizi v. Thornburgh,* 719 F.Supp. 86, 88 (D.Conn.1989). I disagree. No such presumption exists. Rather, the statute permits an alien who marries during deportation proceedings to petition for permanent resident status after completing the two-year exile. Thus, § 5 may be viewed as serving two functional objectives: detecting and deterring marriage fraud that is, detecting marriage fraud by waiting to see which marriages or petitions survive the two-year delay, and deterring it by postponing the application for residency.

B. *Procedural Due Process.* The Supreme Court has repeatedly recognized that in reviewing Congress' control over immigration a distinction is drawn between (1) legislation that defines substantive categories of aliens subject to different immigration restrictions, and (2) legislation that establishes procedures for enforcing the different treatment prescribed for the different categories of aliens. Congress' choices regarding categories of aliens and its determination regarding which groups

of aliens are entitled to enter or stay in the United States are subject only to the most narrow judicial review; but once those choices have been made the procedures enacted to enforce Congress' will are judicially scrutinized under the traditional standards of procedural due process. *See Landon v. Plasencia*, 459 U.S. 21, 32, 34–35, 103 S.Ct. 321, 329, 330–31, 74 L.Ed.2d 21 (1982) ("once an alien gains admission to our country and begins to develop ties that go with permanent residence ... [he] is entitled to a fair hearing when threatened with deportation"); *Francis v. INS*, 532 F.2d 268, 273 (2d Cir.1976). In *Yamataya v. Fisher (The Japanese Immigrant Case)*, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903), the Supreme Court held that an alien who has entered the country and established residency here, even if illegally, is entitled to an "opportunity to be heard upon the questions involving his right to be and remain in the United States." *Id.* at 101, 23 S.Ct. at 615. In that case, the Court read into a statute—allowing the Secretary of the Treasury to deport an alien upon belief that the alien was illegally in the country—a requirement that the alien be allowed an opportunity to be heard upon the questions involving his right to remain. *Id. See also Fiallo*, 430 U.S. at 794, 97 S.Ct. at 1479 (distinguishing judicial review of procedures used to enforce immigration restrictions from review of classification of aliens).

Thus, in determining what standard of review to employ in judging the constitutionality of § 5 it must first be determined whether that section is a substantive classification—establishing a distinct class of aliens subject to particular immigration treatment—or a procedural provision prescribing a particular means to establish membership in a particular substantive class. In light of the purpose and function of the section, as well as other indicia such as its title, § 5 must be considered procedural.

C. *Substance versus Procedure.* According to *Fiallo*, Congress may select practically any criteria to create different classes of aliens so long as its choice is rationally related to a legitimate govern-

ment interest. 430 U.S. at 796, 97 S.Ct. at 1480. The majority here characterizes § 5 as a substantive provision creating two distinct classes of aliens: those who marry a citizen *during* deportation or exclusion proceedings and those who marry a citizen *before or after* such proceedings. The substantive classifications underlying § 5 are more appropriately defined as aliens who enter into *bona fide* marriages with American citizens and those whose marriages are fraudulent. My respected colleagues apparently conclude that § 5 creates a new substantive classification because it imposes different treatment for aliens whose circumstances or characteristics fall within that section. Inherent in the majority's view is the notion that Congress creates a new category of aliens *anytime* it commands different treatment for some aliens based upon a characteristic which then, according to my colleagues, defines the new class.

The problem with this approach is that it could transform *every* procedural mechanism into a substantive classification. This would be accomplished simply by terming as "sub-categories" the procedures designed by Congress to enforce distinctions between different categories of aliens. In other words, by characterizing a provision that establishes a method for determining which marriages are *bona fide* as if it creates a new substantive class, the majority allows a right (i.e. the right to have "immediate relatives" enter or remain in this country) to be defined by the procedures that Congress mandated must be followed before a person may be deprived of this right.

The Supreme Court declined to take the path down such a slippery slope in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), where it held that statutory entitlements could not be defined by the procedures created for their deprivation. *Id.* at 541, 105 S.Ct. at 1493. *See also Goldberg v. Kelly*, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970) (Congress cannot skirt due process requirements by arguing that the interest deprived is a "privi-

lege" and not a "right"); *Francis,* 532 F.2d at 273 ("We do not dispute the power of the Congress to create different standards of admission and deportation for different groups of aliens. However, once those choices are made, individuals within a particular group may not be subjected to disparate treatment on criteria wholly unrelated to any legitimate governmental interest.").

The operation of the statute demonstrates that Congress' choice as to who may ultimately enter or stay in the United States as a permanent resident does not create classifications that may be distinguished, as the majority does, on the basis of the timing of an alien's marriage, for even those married during deportation proceedings are entitled to full permanent resident status after the two-year exile period. Instead, Congress determined that *bona fide* spouses of United States citizens are entitled to permanent resident status and fraudulent spouses are not. *See* § 1186a(b). Common sense argues that this is what motivated Congress to enact that section of the Amendments. The distinctions based upon the timing of a marriage are bereft of meaning unless viewed as a method of promoting compliance with the underlying policy choice that only legitimate alien spouses are entitled to immediate relative status. Congress surely did not enact § 5 to express its disapproval of *legitimate* marriages entered into during deportation proceedings. The logical conclusion is that § 5 is aimed at enforcing different treatment for two actual classes of aliens—those who are legitimate spouses of citizens and those who are fraudulent spouses.

There are other indicia of § 5's procedural nature. The provision requiring an alien spouse to remain two years outside of the country is contained in a section entitled *"Procedure* for granting immigrant status." 8 U.S.C. § 1154 (emphasis supplied). The legislative history of the Immigration Fraud Amendments speaks exclusively of the enactors' aim to deter immigration related marriage fraud. H.R.Rep. No. 99–906, 99th Cong., 2d Sess. 6, *reprinted in* 1986 Code Cong. & Admin.News 5978.

Senator Paul Simon—the chief sponsor of the Amendments in the Senate—has indicated that the harsh consequences of § 5 were unforseen and unintended. 134 Cong. Rec. S1625 (daily ed. Feb. 29, 1988) (statement of Sen. Simon). Perhaps most significant, § 5 allows an alien who has married during deportation proceedings to attain full permanent resident status after two years. This plainly suggests that those who marry during deportation proceedings are not ultimately less deserving of preferential immigration status as an immediate relative, but are merely more suspect as possible frauds. Section 5 was designed to weed out through detection and deterrence those fraudulent marriages from legitimate ones.

Further, the distinction between § 5 and the provision challenged in *Fiallo* highlights § 5's procedural nature. *Fiallo* upheld a provision of the Act that defined children for the purpose of immediate relative status. The definition included all possible parent-child relationships, including a biological mother and her illegitimate child, but excluded the relationship between a biological father and his illegitimate child. Though challenged as a violation of the Equal Protection Clause for discriminating on the basis of both gender and legitimacy, the Supreme Court held that Congress' sovereignty is nearly complete in the area of defining the classes of immigrants who would be allowed into the country. The challenged section in *Fiallo* is clearly substantive because it defines the group of "immediate relatives" who may enter the country outside of the quota restrictions. Quite to the contrary, § 5 does not define the class of immediate relatives; it merely sets up a procedure to deter or detect those who would attempt fraudulently to include themselves in that class.

D. *Due Process Review.* Viewing § 5 as a procedural provision, as I believe we must, it is subject to the traditional scrutiny courts give to ensure that procedures employed to enforce substantive legislative policies meet the minimum standards of due process. *See Fiallo,* 430 U.S. at 794, 97 S.Ct. at 1479; *Plasencia,* 459 U.S. at

34–35, 103 S.Ct. at 330–31; *see also Rafeedie v. INS*, 880 F.2d 506, 519–20 (D.C. Cir.1989) ("[T]he Due Process Clause 'is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave congress free to make any process "due process of law," by its mere will.' ") (quoting *Murray's Lessee v. Hoboken Land and Improvement Co.*, 18 How. 272, 276, 15 L.Ed. 372 (1855)).

Three factors are weighed to determine whether § 5 satisfies the Due Process Clause: 1) the private interest affected, 2) the risk of an erroneous deprivation of this interest through the procedures established in the statute and the probable value of additional or substitute procedures, and 3) the government's interest, including the burdens that additional or substitute procedures would create. *Mathews v. Eldridge*, 424 U.S. 319, 332–35, 96 S.Ct. 893, 901–03, 47 L.Ed.2d 18 (1976); *Plasencia*, 459 U.S. at 34, 103 S.Ct. at 330.

1. *The Private Interest Affected.* An alien—even one who initially may have entered the country illegally—has a strong interest in remaining "in this land of freedom." *Plasencia*, 459 U.S. at 34, 103 S.Ct. at 330; *see also Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976); *Rosenberg v. Fleuti*, 374 U.S. 449, 460, 83 S.Ct. 1804, 1811, 10 L.Ed.2d 1000 (1963); *Yamataya*, 189 U.S. at 100–02, 23 S.Ct. at 614–15. Further, the rights protected by our Constitution include the right to marry and to have a marriage free from undue governmental interference. *See Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); *Griswold v. Connecticut*, 381 U.S. 479, 485–86, 85 S.Ct. 1678, 1682–83, 14 L.Ed.2d 510 (1965); *see also id.* at 495, 85 S.Ct. at 1687. (Goldberg, J., concurring). "The right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process." *Escobar v. INS*, No. 89–5037, slip op. at 10–11 (D.C.Cir. Feb. 2, 1990) (quoting *Plasencia*, 459 U.S. at 34–35, 103 S.Ct. at 330–31), *withdrawn pending reh'g en banc* (April 25, 1990). In addition, a citizen spouse is statutorily entitled to petition the INS to obtain immediate relative status for an alien spouse. 8 U.S.C. § 1154(a)(1); *see Escobar*, slip op. at 9; *cf. Goldberg v. Kelly*, 397 U.S. at 262 n. 8, 90 S.Ct. at 1017 n. 8.

The private interests at stake are great. This is true not only for the alien seeking immediate relative status, but also for the citizen seeking permission for a spouse to remain in this country. The dilemma presented by this law to a citizen, who must choose between a two-year separation from her newlywed husband or a two-year exile from her country, family, friends, home and job, is extremely harsh. *See, e.g., Escobar*, slip op. at 9. Thus, the private interests affected by the proposed government action must weigh heavily in the due process analysis.

2. *The Risk of Erroneous Deprivation and the Value of Substitute Procedures.* Statistics issued by the INS and testimony before Congress indicate that approximately 70 percent of the marriages that occur during deportation proceedings are above suspicion; only about 30 percent of such marriages are *suspected* of being fraudulent. H.R.Rep. No. 99–906, 99th Cong., 2d Sess. 6, *reprinted in* 1986 U.S.Code Cong. & Admin.News at 5978. Even assuming that all marriages suspected of being fraudulent are so in fact, the risk of erroneous deprivation is still overwhelming. To put it another way, *70 percent* of the couples that have *bona fide* marriages subject to § 5's two-year banishment are deprived of the right to remain together in this country.

As for the probable value of additional or substitute procedures, employing them obviously would reduce the risk of such deprivations. As § 5 now stands, there are, for all practical purposes, *no* procedures established prior to the deprivation. Moreover, the procedures that permit a couple to petition for permanent resident status after the two-year period do not alleviate the deprivation. *See Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) (due process requires opportunity to be heard "at a meaningful time"). Were the INS to allow a couple to

present evidence of the legitimacy of their marriage prior to the deprivation, it may logically be seen that most of those aliens who would otherwise be exiled could demonstrate that their marriage is above suspicion. In other words, the risk of erroneous deprivation as to 70 percent of those who marry during deportation proceedings would be alleviated by granting them a hearing at which they could demonstrate the validity of their marriage. Hence, the risk of erroneous deprivation under § 5 is great, and substitute procedures would also be of significant value.

3. *The Government's Interest.* The government's interest in the procedure established by § 5 is, as noted, the detection and deterrence of fraudulent marriages perpetrated to obtain preferential immigration status. Concededly, this interest is substantial. Immigration marriage fraud is certainly not a "victimless crime." Those who engage in it unfairly cut in front of those aliens lawfully waiting in line to emigrate here. This kind of marriage fraud undermines the sovereign power of the United States to control who may be allowed resident status. Yet, upon closer analysis of the procedure employed by § 5 to deter and detect marriage fraud, it is obvious that it will have limited effectiveness.

To begin with, there is little reliable evidence showing that aliens facing deportation proceedings are more likely to enter into sham marriages than aliens not facing such proceedings. The INS's marriage fraud survey—upon which Congress relied in finding that 30 percent of the marriages entered into during deportation proceedings might be fraudulent—has been attacked as unreliable by two former general counsel to the INS. Further, because of loopholes in the statute § 5 itself does not contain a substantial disincentive to those who would attempt to enter into a fraudulent marriage to evade immigration restrictions. A couple intent on committing marriage fraud, for example, can easily circumvent § 5. If deportation proceedings have been initiated, an alien need only leave the country voluntarily to terminate them, and after the alien departs § 5 is no longer

applicable. The couple could then either marry outside of the United States, or the alien could return and marry before deportation proceedings are initiated again. In both instances, the couple would not be subject to § 5—since they would have married at a time when no deportation proceedings were pending—and the citizen would be entitled to petition for immediate relative status and conditional permanent residency for her spouse under § 2. In the alternative the couple could apply for a fiance visa while the alien was still abroad after voluntary departure. 8 U.S.C. § 1101(a)(15)(K).

Thus, § 5 does not effectively distinguish between fraudulent and legitimate marriages, but only between couples who are able to travel outside the United States to circumvent the law and couples who, for financial, health or other reasons, cannot. This sort of distinction obviously does not serve the government's interest in deterring sham marriages. In fact, we ruled that a similar distinction failed to meet the minimum standard of the rational basis test. *See Francis v. INS*, 532 F.2d 268. In *Francis*, employing the same rational relationship standard the majority uses here, we struck down an immigration statute that gave greater rights to aliens who briefly left the country and then returned than to aliens who never departed. We held that the Equal Protection Clause required that resident aliens "who are in like circumstances, but for irrelevant and fortuitous factors, be treated in a like manner." *Id.* at 273.

Further, § 5 actually acts to undercut the government's ability to distinguish between fraudulent and legitimate marriages. The two-year separation it imposes certainly places a greater emotional and psychological strain on legitimately married couples than on fraudulent ones whose emotional bonds are non-existent. It is the legitimate couple that bears a greater risk of having their marriage fail as a result of separation at this early and crucial stage. The fraudulent couple can continue their sham more easily than they could have without § 5, for they now have a perfect

excuse for leading separate lives and failing to establish the normal indicia of married life. When an alien engaged in marriage fraud applies for a permanent resident visa after this two-year period abroad, it will be very difficult for the government to determine whether the marriage is fraudulent since the couple justifiably will have not lived together for two years. In addition, since the couple will have been married for at least two years, the government will now have only one interview at which it can investigate the couple rather than the two investigations it conducts under § 2, and there will be no period of conditional permanent residency. *See* § 1186a(g)(1).

Moreover, the burdens on the government of having substitute procedures would be minimal. All that would be required to provide sufficient due process to couples married during deportation proceedings is a hearing prior to imposition of the two-year exile. Since the government already conducts such hearings at the end of the two-year period—and under § 2 in cases where a couple is married less than two years but when no deportation proceedings are pending—the administrative burden of providing a hearing to couples prior to imposition of a two-year exile is slight.

In weighing the due process factors discussed, it becomes clear that the process provided by § 5 does not meet the constitutional standard. The private interests affected by § 5 and the risk of erroneous deprivation are great while the efficacy of the statute in serving the government's interest in distinguishing between legitimate and fraudulent marriages is doubtful at best. Consequently, in my view, since the provisions of § 5 of the Immigration Fraud Amendments fail to meet due process standards, the section should be struck down as unconstitutional.

## CONCLUSION

For the reasons stated above, I dissent and vote to reverse the grant of summary

judgment in favor of the Attorney General of the United States.