**Emilio COPPOLA, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 95 Civ. 4995 (JSR).**

United States District Court, S.D. New York.

Sept. 5, 1996.

*FINDINGS OF FACT AND*
*CONCLUSIONS OF*
*LAW*

RAKOFF, District Judge.

Having already received a windfall of nearly a half million dollars as a result of errors by the Internal Revenue Service, convicted tax felon Emilio Coppola seeks refund of an additional $24,059.75 on the basis of what he alleges were IRS mistakes. The cause was tried to the Court on May 13, 1996. While the evidence suggests that the IRS may be entitled to a gold medal for bungling, it fails to support Mr. Coppola's instant claim. More particularly, the Court hereby makes the following findings of fact and conclusions of law.

### Findings of Fact

In 1986, Emilio Coppola pled guilty to one count of attempted tax evasion for 1981. Ex. 1.[1] Thereafter, on April 15, 1987, the IRS sent a statutory notice of deficiency, Ex. 2, to Mr. Coppola and his former wife, informing them that they owed past taxes of $1,397,-908.44 and penalties of $698,954.22, broken down as follows:

| Calendar Year Ended | Deficiencies | Fraud Penalty |
|---|---|---|
| December 31, 1979 | $365,315.90 | $182,657.95 |
| December 31, 1980 | $674,915.06 | $337,457.53 |
| December 31, 1981 | $357,677.48 | $178,838.74 |

The total of the liabilities was therefore $2,096,862.66.[2]

Mr. Coppola challenged the assessment in the United States Tax Court and, on September 1, 1988, reached a settlement with the IRS, Ex. 3, by which it was agreed that he owed, for 1979, a tax deficiency of $282,148 and a tax fraud penalty of $146,000; for 1980, a tax deficiency of $231,641 and a tax fraud penalty of $136,626; and for 1981, a tax deficiency of $162,568 and a tax fraud penalty of $81,284. Both parties knew that, by law, interest would also have to be paid on the sums due, but the settlement agreement did not specify the exact amount of interest owed, Tr. 8; Ex. 3.

Barton D. Eaton, White Plains, NY, for Plaintiff.

U.S. Attorney's Office, New York City (Judith Mogul, of counsel), for Defendant.

---

1. "Ex." refers to exhibits at the May 13, 1996 trial and "Tr." to the transcript of that trial.

2. The notice of deficiency limited the liability of Mr. Coppola's former wife to the $1,397,908.44 owing for unpaid taxes, and did not assess tax fraud penalties against her. Ex. 2.

Problems soon arose in computing the interest owed on the principal amounts recited in the settlement agreement. In approximately October of 1988, Mr. Coppola hired Michael S. Hochman, a partner in the accounting firm of Kahn, Hoffman, Nonemacher & Hochman, to assist him in resolving these and other disputes with the IRS. Tr. 6. Mr. Hochman at some point thereafter had a telephone conversation with one Tony Mancuso of the Bardonia, New York Regional Office of the IRS to discuss the proper way to compute interest on the amounts set forth in the settlement agreement. Tr. 18. According to Mr. Hochman, Mancuso told Hochman that the interest should be calculated as simple interest up to 1987, and compounded thereafter. Tr. 18.

It is now undisputed that this was erroneous advice and that the interest should have been compounded starting in 1983. Tr. 5; 17–18; 32; 40; 45. Nevertheless, Hochman claims to have accepted the advice—which gave Mr. Coppola a very substantial benefit—without question. After performing interest calculations based on this advice, he entered into discussions with another IRS agent, James G. O'Grady of the White Plains Regional Office of the IRS. While there was originally disagreement between the two as to how the compounding of the interest should be accomplished, Hochman testified that in December, 1988 he succeeded in convincing O'Grady to adopt his calculations. Tr. 8–11.

Thereafter, on December 15, 1988, Hochman mailed a letter to O'Grady that purported to recite a final agreement regarding Coppola's liabilities to the IRS. Tr. 9; Ex. A. The letter enclosed six checks in purported satisfaction of Mr. Coppola's respective deficiency and fraud liabilities, including interest, for each of the three years in question. Tr. 9; Ex. A–1. While the checks were accepted and cashed, however, O'Grady had already made clear to Hochman that they would simply be applied toward any amounts due and that O'Grady did not have the authority to accept the agreement recited in the December 15, 1988 letter as final. Hochman acknowledged as much on cross-examination, conceding that O'Grady "indicated that he

was going to be reviewing this with his supervisors. And I remember distinctly that Mr. O'Grady indicated to me that he would not sign off on any letter that specifically stated that he was settling a hundred percent until such time as he would be able to review it with his superiors." Tr. 34.

Therefore, as Hochman understood, the agreement recited in the December 15, 1988 letter was not final and binding on the IRS unless and until it had been reviewed and accepted by O'Grady's superiors. Tr. 33–34. While Hochman testified that, nonetheless, he thereafter assumed that the agreement had been accepted, he stated that he based this assumption on an uncertain recollection of having afterwards received a confirmatory "Notice of Adjustment." Tr. 34. But, in fact, what he received were merely courtesy copies of "Request For Adjustment" forms that O'Grady had submitted to his superiors, seeking approval of the terms proposed by Hochman. Tr. 34–35; Ex. B. There is no document in the record from the IRS to the plaintiff stating that the IRS accepted the terms proposed by Hochman to O'Grady, and the Court draws the inference that no such document was ever sent to Mr. Coppola or to any of his agents.

Furthermore, additional IRS records, introduced by the plaintiff as Exs. I and J, and dated November 11, 1988, show that, as to the tax fraud penalties, the IRS accepted the payments enclosed with the December 15, 1988 letter in full satisfaction of Mr. Coppola's tax fraud penalty balances for the tax years 1980 and 1981 only. Tr. 12–13. While receiving these notices respecting 1980 and 1981, Mr. Coppola did not receive any similar notice indicating that the tax fraud penalty for the tax year 1979 had been paid in full, Tr. 39–40, and the Court again draws the inference that no such notice concerning the 1979 tax fraud penalty was ever sent. Mr. Coppola therefore had further notice that the amount of taxes and penalties due and owing for 1979 remained in dispute.

In June of 1991, Coppola received a notice from the IRS stating that he owed $602.23 on the fraud penalty for the tax year 1979. Tr. 14; Ex. K. Although this in fact related to some of the recalculated interest on the pen-

alty portion of the 1979 taxes, this was not obvious from the face of the document. Hochman thereupon had conversations with yet another IRS agent in the Bardonia Regional Office, Gregory Tsogranis, trying to convince the IRS that all of Mr. Coppola's liabilities had been satisfied in full. Tr. 14. While Hochman believed that Tsogranis agreed with him, the balance kept appearing. Tr. 14. Finally, Mr. Coppola decided to simply go ahead and pay the $602.23 in the belief that it might resolve the confusion. Tr. 14–15.

In April of 1992, however, the IRS sent Mr. Coppola correspondence indicating that there was an additional balance of $24,059.75 due for the tax period ending December 31, 1979. Tr. 20. This amount, representing the remainder of the recalculated interest for 1979 due and owing, is the claim here in dispute.[3] In response, Hochman wrote to Charles Barry of the White Plains Regional Office, explaining his understanding that Coppola had an agreement with the IRS pursuant to which all of his liabilities had been paid in full. Tr. 20; Ex. L.

Hochman further asked Barry at the IRS to send him a transcript showing how the IRS had determined that such a balance remained. Tr. 22; Ex. N. According to Hochman, he wanted the document to see whether a 1981 overpayment had been credited to the 1979 penalty, as he had intended and proposed. Although Hochman testified on direct examination that the resulting IRS transcript, Ex. N, ended up with a zero balance, Tr. 24, Hochman conceded on cross-examination that the IRS transcript did not include the 1979 tax fraud penalty at all; in other words, it was not a complete transcript of Mr. Coppola's liabilities to the IRS for 1979, and Mr. Hochman knew it. Tr. 26.

Furthermore, Mr. Hochman, as he admitted, knew at the time from the very face of the transcript that the IRS had calculated a greater amount of interest than Hochman's prior calculations had shown was due. Tr. 24. In other words, it was clear to Hoffman that the IRS was not accepting the (inaccu-

rate) method of calculation embodied in Hochman's December 15, 1988 letter. However, he decided not to pursue the issue, because "in the end, the balance [for 1980 and 1981] came down to zero. So, you know, we were somewhat contented with that." Tr. 24. Effectively, Hochman chose not to re-open the issue of proper interest calculation if there was some way to resolve the $24,000 question for 1979 while letting sleeping dogs lie as to 1980 and 1981.

While the dispute about the additional $24,059.75 continued, Mr. Coppola was in the process of completing a divorce settlement with his wife. Tr. 62. As he admitted, Mr. Coppola knew about the IRS's claim for this additional amount before he signed the divorce agreement. Tr. 62. Indeed, the divorce settlement was the occasion for his payment of this liability that he now seeks to recoup in this refund suit. Specifically, under the divorce settlement that was eventually negotiated, Coppola had to make a lump sum payment of $500,000 to his wife. Tr. 47. To obtain the money to make that payment, Coppola, who is in the real estate business, found it necessary to refinance some of his properties. Tr. 49. At a closing related to the refinancing, a title company discovered a federal tax lien for the $24,059.75 that Coppola was disputing with the IRS. Ex. M. The mortgage that Coppola needed could not close without that tax lien first being satisfied, so Coppola paid the lien, together with approximately $13,000 in additional interest. Tr. 49–50; Ex. C. To be sure, the cover letter accompanying Coppola's December 16, 1992 payment stated that he was paying "in protest," Tr. 51; Ex. E, but, in exchange, Coppola got a release from the IRS that enabled him to complete the mortgage closing and force the divorce settlement. Tr. 51–52; Ex. D. Moreover, less than two months later, on or about February 10, 1993, Coppola received back from the IRS a check for $13,646, which represented the additional interest he had paid on the $24,059.75, Tr. 53; Ex. F, the IRS having apparently concluded that the amount was improperly assessed.

---

**3.** Specifically, the $24,059.75 represents the properly calculated interest for 1979 less various credits in Coppola's favor arising from prior pay-

ments and from a credit for 1981 that Hochman had asked be applied against the 1979 deficiencies. Tr. 40–41.

However, the IRS, having now focused more fully on Hochman's error in interest calculation, went back and did a new top-to-bottom interest calculation for all these years—1979, 1980, and 1981—and found that Mr. Coppola actually should have paid the IRS half a million more dollars than it had claimed. Tr. 53. After coming to this conclusion, the IRS asserted this full tax claim against Coppola, who, on October 31, 1994, filed for bankruptcy protection. Tr. 54; Ex. U. But the IRS, perhaps because it had previously accepted the miscalculated amounts for 1980 and 1981, gave up without much of a fight and, by a stipulation dated April 20, 1995, agreed to dismiss its $536,-611.99 claim against Coppola. Thus, although Hochman's interest calculation had been in error, in the end Mr. Coppola was the beneficiary of a huge windfall. Of the more than $550,000 that the IRS now realized it should have collected from Coppola beyond his original payments, the only portion it actually collected was the $24,079.75 he had paid in order to facilitate his divorce. Nonetheless, Coppola decided to pursue the present refund action against the Government for the $24,059.75.

*Conclusions of Law*

■ Mr. Coppola claims that the IRS is estopped from asserting that his interest calculations are incorrect, because (a) an IRS agent told him to calculate the interest the way he did, (b) a different IRS agent agreed with and accepted his calculations, and (c) by entering into the 1995 stipulation that released its interest claims for 1980 and 1981, the IRS must, in effect, have accepted this calculation. According to Coppola, the IRS must therefore refund the $24,059.75 sought, notwithstanding that Coppola no longer disputes that his original calculations were inaccurate and that accurate calculations would have required him to pay the $24,079.75 and a half million dollars more. Thus, the question is whether Coppola has established the elements of an equitable estoppel against the Government.

At the outset, it must be noted that a private litigant bears a heavy burden in establishing an equitable estoppel against the Government. "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Thus, estoppel against the Government is applied "only in those limited cases where the party can establish *both* that the Government made a misrepresentation upon which the party reasonably and detrimentally relied *and* that the Government engaged in affirmative misconduct." *City of New York v. Shalala*, 34 F.3d 1161, 1168 (2d Cir.1994) (emphasis added); *see also Azizi v. Thornburgh*, 908 F.2d 1130, 1136 (2d Cir.1990).

Notwithstanding these clear and binding precedents, Coppola urges this Court to apply the five-factor test of equitable estoppel set forth in the case of *Tonkonogy v. United States*, 417 F.Supp. 78, 79 (S.D.N.Y.1976), which does not expressly adopt the additional requirement of affirmative misconduct. But *Tonkonogy*, like the other two cases on which Coppola relies, *In re La Difference Restaurant, Inc.*, 63 B.R. 819 (S.D.N.Y.1986) and *Corniel–Rodriguez v. Immigration and Naturalization Serv.*, 532 F.2d 301 (2d Cir.1976), predate *Shalala* and *Azizi* and must therefore be regarded as modified in light of these more recent precedents.[4]

Nevertheless, the factors stated in *Tonkonogy* are a useful starting point for analyzing the elements of estoppel against the Government, as long as one is careful to add the additional requirement of affirmative misconduct. The five *Tonkonogy* factors are "(1) a misrepresentation by an agent of the United States acting within the apparent scope of his duties; (2) the absence of contrary knowledge by the taxpayer in circumstances where

---

4. Moreover, the Second Circuit has already expressly limited *Corniel–Rodriguez* to its facts. *See Goldberg v. Weinberger*, 546 F.2d 477, 481 n. 5

(2d Cir.1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977).

he may reasonably act in reliance; (3) actual reliance; (4) detriment; and (5) a factual context in which the absence of equitable relief would be unconscionable." 417 F.Supp. at 79. With or without the additional factor required by *Shalala* and *Azizi*—(6) affirmative misconduct by the Government—Coppola woefully fails to establish an equitable estoppel against the Government.

As to the first factor—a misrepresentation by an agent of the United States acting within the apparent scope of his duties—Coppola relies on the original, erroneous advice allegedly given by IRS employee Mancuso as to how to calculate the interest owed on Coppola's balances, and the subsequent acceptance by IRS employee O'Grady of the calculations made by Hochman in accordance with Mancuso's advice.[5]

■ Regarding Mancuso, it is by no means apparent that giving advice of the kind sought by Hochman was within Mancuso's apparent scope of authority. But even assuming *arguendo* that it was, the mistaken advice he gave was erroneous advice of law, not fact, and therefore cannot form the basis of an estoppel. *See, e.g., Metals Refining Ltd. v. Commissioner of Internal Revenue Serv.*, 65 T.C.M. (CCH) 2171, 1993 WL 89189 (U.S.Tax Ct.1993) (no estoppel because IRS agent's alleged acceptance of returns as constituting satisfactory filing was at most a misrepresentation of an issue of law); *Birnbaum and Manaker, P.C. v. Commissioner of Internal Revenue*, 66 T.C.M. (CCH) 1087, 1993 WL 414721 (U.S.Tax Ct.1993) (no estoppel because IRS agent's alleged misrepresentation concerning the manner in which a particular deduction would be reclassified was a misrepresentation of law, not a statement of fact); *see also Goldberg*, 546 F.2d at 481 ("Even detrimental reliance on misinformation obtained from a seemingly authorized government agent will not excuse a failure to qualify for the benefits under the relevant statutes and regulations.") Here, the misrepresentation attributed to Mancuso was simply an incorrect statement of the applica-

ble IRS regulations concerning the calculation of interest on deficiencies and penalties, a matter of law that Hochman could readily have determined himself by checking the applicable regulations.

As for O'Grady's alleged acceptance of the Mancuso-based calculations, Hochman testified that O'Grady actually emphasized to him the fact that O'Grady lacked the authority to agree to a final settlement of the interest issue. Tr. 34. Hochman knew, then, that his December 15, 1988 letter to O'Grady was no more than a proposal that would not be a final agreement unless and until it had been approved by O'Grady's supervisors. After receiving the December 15, 1988 letter and the accompanying checks, the IRS, while cashing the checks, sent Coppola notices stating that the tax penalties for the tax years 1980 and 1981 had been paid in full, Ex. I and Ex. J, but sent no such notice concerning the 1979 tax fraud penalty. At a minimum, therefore, Hochman was placed on notice that the IRS was not accepting his calculations for 1979, the only year that relates to the $24,079.75 here in issue.

Any uncertainty on this score was shortly removed, moreover, by the IRS transcript, Ex. N, given to Hochman at his request. The transcript indicated on its face that the IRS had calculated a greater amount of interest due for 1980 and 1981 than the Mancuso-based calculations would have permitted. Further, the transcript did not include any 1979 tax fraud penalty among its calculations, so as to make plain that the fact that the transcript showed that there was a zero balance owing for 1980 and 1981 did not speak to what still might be due for 1979. The fact that Hochman nonetheless chose, as a matter of strategy, not to inquire further about the IRS's calculations, Tr. 24, only confirms that, far from being deceived, he deliberately sought, by "lying low," to escape without further damage.

As to the second *Tonkonogy* factor—the absence of contrary knowledge by the taxpayer in circumstances where he may rea-

---

5. While the record is unclear as to whether these events played any role in the IRS's 1995 "settlement" (*i.e.*, withdrawal) of its half million dollar claim against Coppola, that settlement has no

binding effect on this Court and provides no further basis on which estoppel can be predicated, since by 1995 the IRS had expressly notified Coppola of the error in his prior calculations.

sonably act in reliance—it is implicit from the preceding discussion that Coppola has similarly failed to satisfy this factor. To the extent that Coppola bases his claim on the misrepresentation of the law made by Mancuso, his reliance was not reasonable and, indeed, he is presumed to have contrary knowledge. *Cf. Heckler*, 467 U.S. at 63, 104 S.Ct. at 2225 ("general rule [is] that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to the law.") To the extent that Coppola claims to have relied on O'Grady's alleged agreement with his calculations, Coppola's reliance is again unreasonable, as O'Grady explicitly told Coppola's accountant Hochman that O'Grady did not have the authority to approve a final agreement. Finally, Coppola cannot claim an absence of contrary knowledge, or the slightest basis for continued reliance, once the IRS's responses to his accountant's inquiries (first in the response to the December 15, 1988 letter and then in the IRS transcript) had put him on clear notice that the IRS had not accepted his calculations for the 1979 year.

These same considerations also establish that Coppola has failed to satisfy the third *Tonkonogy* factor—actual reliance. As noted, whatever misunderstanding of law Hochman may originally have had, he learned of his error well before paying the $24,079.75 here in issue, and went ahead and made the payment only as a matter of strategy and convenience in his divorce settlement.

This leads in turn to the fourth factor—detriment. Mr. Coppola testified at the trial that, had he known that he would have to pay an additional $24,059.75, he might have negotiated a different settlement with his wife, presumably some amount lower than the lump sum of $500,000 he paid. But there is not a shred of contemporaneous evidence to support this self-serving speculation. Instead, as noted, the evidence established that Coppola already had notice of the dispute over the $24,059.75 at the time that he was negotiating the agreement with his wife, so that he could have factored it in to that settlement if he had wished. That he (allegedly) did not so consider it is most likely related to the fact that the tax fraud penal-

ties assessed by the IRS were assessed solely against Mr. Coppola, and not against his wife. It is speculative and unconvincing to suppose that the former Mrs. Coppola would have agreed to split a debt with Mr. Coppola that was his individual debt. In short, Mr. Coppola has not carried his burden on the fourth factor.

As to the fifth factor—a factual context in which the absence of equitable relief would be unconscionable—Mr. Coppola has already benefitted from the errors committed by the IRS to the extent of more than a half million dollars. In this context, to deny him return of an additional $24,059.75 that he owed to the Government (just as surely as he actually owed the half million dollars) is hardly unconscionable.

Finally, as to the sixth factor (specified in *Shalala*)—affirmative misconduct by the government—the Court finds no evidence of affirmative misconduct toward Mr. Coppola. If there has been misconduct at all, it is in the way in which the IRS has permitted Mr. Coppola to escape a half million dollars in liability, a gross and wanton failure that the Government, inexplicably, has made no effort to explain to this Court. But as regards the IRS's conduct toward Coppola of which he now, having reaped a windfall, has the audacity to complain, he has failed to show any such errors were the product of anything but negligence, and negligence is not affirmative misconduct. *Azizi*, 908 F.2d at 1136.

In sum, Mr. Coppola has failed to satisfy a single one of the six essential elements of a claim of equitable estoppel against the Government.

### JUDGMENT

Based on the foregoing findings of fact and conclusions of law, the Court finds that Emilio Coppola has failed to prove his claim for a refund of $24,059.75. Accordingly, this Court orders judgment in favor of the defendant, the United States of America.

Clerk to enter judgment.

SO ORDERED.