ESTATE OF TIMOTHY F. CARBERRY, DECEASED, MANUFACTURER'S HANOVER TRUST CO., AND ELLA J. BRADY, F.K.A. ELLA J. CARBERRY, EXECUTORS, AND ELLA J. BRADY, F.K.A. ELLA J. CARBERRY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 27350-88.    Filed July 16, 1990.

*Patrick W. Hennessey* and *William L. O'Conor, Jr.,* for the petitioners.

*Scott P. Borsack,* for the respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined a deficiency of $8,698 in Timothy F. Carberry's (decedent) and Ella J. Brady's (his wife)[1] income tax for the taxable year 1967 and increased the interest rate on the underlying deficiency under section 6621(c).[2] The deficiency arises in respect of a net operating loss carryback from 1970. The issues for decision are whether: (1) A Form 872-A was properly executed; (2) respondent is estopped from asserting a deficiency because he failed to act diligently; (3) a special allocation of partnership intangible drilling costs (IDC) is valid under section 704(b); and (4) the increased interest rate is applicable.

All of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated herein by reference.

At the time of the filing of the petition, petitioner Ella J. Brady resided in Boca Raton, Florida. Decedent and petitioner Ella J. Brady timely filed joint Federal income tax returns for 1967 and 1970 with the Internal Revenue Service.

Decedent died on May 8, 1972, and on June 6, 1972, petitioner Ella J. Brady and Manufacturers Hanover Trust Co. (Manufacturers) were appointed as coexecutors and cotrustees. Manufacturers executed and forwarded to respondent a Form 56, Notice of Fiduciary Relationship (under section 6903 of the Internal Revenue Code) on December 17, 1973 (executors), and on February 23, 1976 (trustees). From January 4, 1974 through March 16, 1979, a series of Forms 872 were executed which extended the statute of limitations for assessment for the 1970 and 1971 taxable years of decedent and petitioner Ella J. Brady, the latest date for assessment being extended to June 30, 1980. The forms were executed by Manufacturers as executor on behalf of the decedent and by Ella J. Carberry or Ella J. Brady as spouse. On March 27, 1980, prior to the expiration of the statute of limitations, respondent accepted and

---

[1]Ella J. Brady was decedent's spouse and was formerly known as Ella J. Carberry.

[2]Unless otherwise indicated, all statutory references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

executed a Form 872-A indefinitely extending the statute of limitations. The Form 872-A was signed by Helen Thome, Vice President, on behalf of the decedent. Above her signature appears the following handwritten statement: "MANUFACTURERS HANOVER TR. CO. & E. JANE BRADY, EXECUTORS." Additionally, the form is signed by "E. Jane Brady (formerly E. Jane Carberry)" on the line provided for "spouse's signature" without any designation as executor.

The decedent's estate was settled by a decree of the Surrogate Court of Nassau County dated April 20, 1978. Respondent never filed with the Surrogate Court a notice of a claim, actual or contingent, for additional income taxes for the year 1967 or 1970 of the decedent.

Decedent was a limited partner in Indonesian Marine Resources (Indomar) in 1970. Indomar was a partner in Southeast Exploration (Souex), an oil exploration general partnership. Indomar was formed to raise the funds necessary to finance the drilling for oil and gas from investors who would be limited partners. Under the Souex partnership agreement, Indomar's initial contribution totaled $8,750,000, which was to repay the partnership costs of the initial exploration program. After this initial contribution, all partners in Souex were required to make contributions in proportion to their partnership interest. The provisions of the Souex partnership agreement allocated income and expenditures, in part, as follows:

(a) All Partnership income shall be allocated to the Partners in the percentages set forth in paragraph (a) of Article I [IIAPCO 59 percent; Carver-Dodge 19.6131 percent; Warrior 7.8452 percent; and Indomar 13.5417 percent] * * * .

(b) All deductions and credits shall be allocated to the Partners in the same proportion that they contribute to the expenditures that created such deductions and credits * * *. Without limiting the generality of the foregoing, all deductions and credits attributable to expenditures representing contributions under paragraph (b) of Article V [Indomar's contributions of not to exceed $8,750,000 to cover "the Partnership's costs of the Initial Exploration Program"] shall be allocated to INDOMAR. * * *

[Brackets used in original.]

During 1970, Indomar partners made investments in Indomar, and Indomar made investments in Souex, of $8,931,284. Souex's partnership return filed for 1970 re-

flected no income and $11,777,288 in deductions, of which $9,004,322 was allocated to Indomar. The 1970 Indomar partnership return reflected losses of $9,224,632.42, which included the $9,004,321.59 partnership loss from Souex. Decedent was allocated his ratable share of Indomar's losses from Souex, which he carried back to 1967. On August 11, 1971, respondent received from decedent and petitioner Ella J. Brady a completed Form 1045, Application for Tentative Refund from Carryback of Net Operating Loss, or Unused Credit, on which they claimed a refund for the taxable year 1967 as a result of a carryback of a net operating loss for 1970 in the amount of $44,009. The claim was allowed, and a refund of $23,545 was issued.

The Souex partnership agreement provided that the partnership would continue until January 1, 1990, unless terminated earlier in accordance with article XII. Under the partnership agreement, distributions upon dissolution were to be made as follows:

(e) Upon the dissolution of the Partnership where the Partnership is not reconstituted as provided in paragraph (a) above, the Partnership shall be completely liquidated, a proper accounting shall be made of the accounts of the Partnership as of the date of dissolution in the same manner as Partnership accounting is made at the end of any fiscal period, and the Partnership's liabilities, obligations to creditors and expenses of liquidation shall be paid. The Partnership properties shall be distributed to the Partners in the manner contemplated by paragraph (c) of this Article XII.

Article XII, paragraph (c), of the Souex partnership agreement provided:

(c) A Partner who withdraws after the First Withdrawal Date upon giving sixty days advance notice to the Partnership shall be entitled to receive an assignment of an undivided interest in the properties of the Partnership determined on an area-by-area or well-by-well basis in accordance with its share of the income therefrom under Article VI hereof, subject to its assumption of its pro rata share of the liabilities and obligations of the Partnership. Upon such withdrawal the withdrawing Partner shall sign and become a party to the Operating Agreement as such Operating Agreement shall be then in effect.

Souex was dissolved by agreement of the partners after the close of business on August 31, 1971. The capital accounts of the Souex partners on the date of dissolution were as follows:

|  | Cash invested by partners of Souex to purchase assets | | Pre-Souex concession costs | Total capital accounts |
|  | Amount | Ratio |  |  |
|---|---|---|---|---|
| IIAPCO | $5,577,921 | 59.0000% | $1,925,008 | $7,502,929 |
| Carver-Dodge | 1,854,248 | 19.6131 | 639,921 | 2,494,169 |
| Indomar | 1,280,238 | 13.5417 | - - - | 1,280,238 |
| Warrior | 741,696 | 7.8452 | 255,968 | 997,664 |
| Total | 9,454,103 | 100.0000 | 2,820,897 | 12,275,000 |

On July 18, 1988, respondent issued a notice of deficiency for 1967 which disallowed the carryback of decedent's distributive share of the special allocation of IDC for 1970 (see section 6501(h)) and which asserted the increased applicable interest rate on the underlying deficiency under section 6621(c).

Before addressing the substantive issue of whether the special allocation of partnership losses should be approved, we dispose of certain procedural matters. Initially, petitioners argue that the Form 872-A executed on March 27, 1980, is invalid because the executors had no power to bind the estate since they were relieved of their duties as of April 20, 1978, and because petitioner Ella J. Brady never signed the Form 872-A in her individual capacity. We disagree.

Section 6903 provides in part:

SEC. 6903(a). RIGHTS AND OBLIGATIONS OF FIDUCIARIES.—Upon notice to the Secretary that any person is acting for another person in a fiduciary capacity, such fiduciary shall assume the powers, rights, duties, and privileges of such other person in respect of a tax imposed by this title * * * until notice is given that the fiduciary capacity has terminated.

In a similar case, involving the predecessor to section 6903, we held a Form 872 valid stating that "once a fiduciary gives notice to respondent of his powers, he is expected to have full authority to exercise these powers with respect to all taxable years until he has notified respondent of termination of such authority." *Eversole v. Commissioner,* 46 T.C. 56, 63 (1966). Cf. *Estate of Krueger v. Commissioner,* 48 T.C. 824, 831 (1967), where we adopted the same

standard in applying section 6903.[3] In the present case, respondent was not notified of the discharge of Manufacturers' authority to act on behalf of decedent, and therefore the Form 872-A executed by Manufacturers is valid. As far as Ella J. Brady is concerned, although the Form 872-A does indicate that she was an executor, she signed the form only on the line designated for "spouse's signature" without designation as executor. We conclude that the Form 872-A is valid as to her, as well as Manufacturers.

We also reject any allegation that respondent should be estopped from asserting a deficiency because he waited until 1986 to indicate that there was a deficiency and until 1988 to send the notice of deficiency, thereby preventing the decedent's estate from deducting the proposed income tax liability for estate tax purposes. At the outset, we note that the foundation for petitioners' argument is far from established in the record. The decedent died in May 1972 so that his estate tax return should have been filed no later than 9 months after his death, February 1973. See sec. 6075. The period of limitations for claiming a refund to take this deduction would have expired in February 1976. Since the first Form 872 as to decedent's income tax is for 1970 and was executed in December 1973, it would appear that petitioners were well aware of the potential income tax liability in ample time to file a protective claim for refund of estate tax. Moreover, although the doctrines of estoppel and quasi-estoppel are applicable against the Commissioner, it is well established that these doctrines should be applied against him with the utmost caution and restraint. Here petitioners have not established the elements necessary for estoppel. *Boulez v. Commissioner*, 76 T.C. 209, 214-215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987). Further, at no time did petitioner Ella J. Brady or Manufacturers seek to terminate the properly executed Form 872-A and thereby accelerate the issuance of the notice of deficiency. Petitioners' assertion of estoppel is simply another version of the claim that a Form 872-A expires by operation of law after a reasonable time. We recently rejected this claim in *Estate of Camara v. Commissioner*, 91 T.C. 957 (1988) (Court reviewed), holding that termination requires a taxpayer to use

---

[3]See also *Estate of Coates v. Commissioner*, T.C. Memo. 1986-574.

Form 872-T and reaffirming our prior decision to the same effect in *Grunwald v. Commissioner*, 86 T.C. 85 (1986). See also *Kernen v. Commissioner*, 902 F.2d 17 (9th Cir. 1990), affg. an order of this Court.

We also reject any claim based on the assertion that respondent failed to mail the notice of deficiency to petitioner Ella J. Brady's last known address. The petition herein was timely filed on behalf of both Manufacturers and Ella J. Brady as executors and Ella J. Brady individually. Such being the case, the notice is valid both for conferring jurisdiction on this Court and for tolling the statute of limitations, irrespective of whether it was mailed to the last known address. *Frieling v. Commissioner*, 81 T.C. 42 (1983).

We next address the substantive issue of whether the special allocation of partnership deductions should be recognized for tax purposes. We hold that it should not.

For the taxable year 1970, section 704(b) provided:

SEC. 704(b). DISTRIBUTIVE SHARE DETERMINED BY INCOME OR LOSS RATIO.—A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership * * * if—

> \*      \*      \*      \*      \*      \*      \*

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

Although the relevant regulations in effect for the year in issue list several factors to consider in determining whether the principal purpose is the avoidance or evasion of taxes, the most important, and the sole test after 1976, is whether the allocation had "substantial economic effect." Sec. 1.704-1 (b)(2), Income Tax Regs.; *Goldfine v. Commissioner*, 80 T.C. 843, 850 (1983). See also *Elrod v. Commissioner*, 87 T.C. 1046, 1083-1086 (1986). An allocation has substantial economic effect if it "may actually affect the dollar amount of the partners' shares of the total partnership income or loss independently of tax consequences." Sec. 1.704-1(b)(2), Income Tax Regs. The applicable standard in determining whether a special allocation has economic effect is that the partner who benefits from a special allocation must also bear the economic burden of such deduction. *Goldfine v. Commissioner, supra* at 851; *Orrisch v. Commissioner*, 55

T.C. 395, 403 (1970), affd. per curiam in an unpublished opinion (9th Cir. 1973). In order to have substantial economic effect, a partner's allocation of an item or deduction must be reflected in his capital account, and in the event of a partnership liquidation, the liquidation proceeds of the entity must be distributed in accordance with the capital balances. Moreover, where a partner's capital account registers a deficit, he must have the obligation upon liquidation to restore the deficit; absent such an obligation, the other partners would have to bear the economic cost of the special allocation that resulted in the deficit. *Elrod v. Commissioner, supra* at 1083-1084; *Goldfine v. Commissioner, supra* at 852.

Petitioners' position herein is based upon contentions that were the subject of critical analysis and rejection in *Allison v. United States,* 701 F.2d 933 (Fed. Cir. 1983), a factually similar case, where taxpayer had invested in a partnership, which in turn invested in Indomar, which in turn invested in Souex, and the taxpayer received his distributive share of the special allocation of IDC from Souex for 1970. The Court of Appeals for the Federal Circuit held that the critical inquiry under section 704(b) was whether the provision for a special allocation had "substantial economic effect" and reversed the lower court's reliance on the business purpose of the allocation. 701 F.2d at 936-938. The Court of Appeals concluded that the terms of the Souex partnership agreement showed that the allocation to Indomar had no economic effect other than tax consequences for the Indomar partners. In reaching its decision, the Court of Appeals pointed to the fact that, although not fatal, the agreement did not contain a gain charge-back[4] provision. See 701 F.2d at 939. What was crucial was the fact that the agreement did not include a stipulation that Indomar's share of partnership assets on liquidation was to be computed according to the capital accounts adjusted for the special allocation. See 701 F.2d at 939-940. The Court of Appeals was unpersuaded by the fact that the agreement provided the books and records were to be kept in

---

[4]A "gain charge-back" provision in the Souex partnership agreement would have provided that Indomar would have been charged with all, or substantially all, partnership profits until it had recouped the losses previously allocated to it. See W. McKee, W. Nelson, and R. Whitmire, Federal Taxation of Partnerships and Partners 10-19 (1977).

accordance with usual and customary accounting practices and that the records seemed to show that Indomar's capital account was adjusted for tax purposes to reflect the amount of the special allocation.

We adopted the *Allison* analysis in *Elrod v. Commissioner, supra,* and *Ogden v. Commissioner,* 84 T.C. 871, 884-885 (1985), affd. 788 F.2d 252 (5th Cir. 1986).[5] See also *Gershkowitz v. Commissioner,* 88 T.C. 984, 1017-1019 (1987). Accordingly, we hold that the special allocation involved herein did not have substantial economic effect, and thus its principal purpose was the avoidance or evasion of taxes under section 704(b).

We next address the imposition of additional interest under section 6621(c), which imposes interest at the rate of 120 percent of the normal rate for any substantial underpayment attributable to "tax motivated transactions." A "tax motivated transaction" includes any sham or fraudulent transaction. See sec. 6621(c)(3)(A)(v). The increased interest rate applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of enactment, and there is no question that the increased interest rate applies to returns filed prior to the enactment of section 6621(c). *Ewing v. Commissioner,* 91 T.C. 396, 422 (1988).

It is clear that a transaction without economic substance is considered "sham" within the meaning of section 6621(c)(3)(A)(v). *Laverne v. Commissioner,* 94 T.C. 637 (1990); *Ferrell v. Commissioner,* 90 T.C. 1154, 1206 (1988). The only question is whether our holding that the special allocation herein was "without substantial economic effect" is the equivalent of holding that the allocation was "without economic substance." We think that it is. Both standards are the foundation of the same conclusion, namely that the principal purpose was tax avoidance. That purpose in turn is clearly the basic frame of reference of section 6621(c). It would be farcical to give a different meaning to the two standards, at least for the purposes of section 6621(c).[6] We find support for this conclusion in *Holladay v.*

---

[5]See also *Hogan v. Commissioner,* T.C. Memo. 1990-295.

[6]See *Young v. Commissioner,* T.C. Memo. 1987-397, where we left open the question of whether these two standards are identical for the purposes of sec. 704(a) and (b)(2).

*Commissioner,* 72 T.C. 571 (1979), affd. 649 F.2d 1176 (5th Cir. 1981), where we held that the allocation of "bottom line" losses of a joint venture lacked economic substance within the meaning of section 704 since the proceeds of the joint venture were to be distributed irrespective of the amount or deficit in the respective capital accounts of the joint venturers. 72 T.C. at 588. In affirming our decision, the Court of Appeals for the Fifth Circuit likewise focused upon the fact, among others, that the loss allocation had no effect on the taxpayer's capital account or upon his share in the event of dissolution and concluded that "the allocation of the venture's losses to Holladay lacked economic substance and was clearly a sham under IRC sec. 704(a)." 649 F.2d at 1180. We sustain respondent's imposition of increased interest accruing after December 31, 1984.

For the above reasons,

*Decision will be entered for the respondent.*