DAVID NADLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
NADLER v. COMMISSIONER
Docket No. 16783-90
United States Tax Court
T.C. Memo 1992-383; 1992 Tax Ct. Memo LEXIS 405; 64 T.C.M. (CCH) 70; July 8, 1992, Filed *405 Decision will be entered under Rule 155. For Petitioner: Norman R. Berkowitz and Jay D. Fischer. For Respondent: Paul N. Schneiderman. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined deficiencies in petitioner's Federal income tax and an addition to tax as follows: Addition to tax
Year
Deficiency
Sec. 6651(a)(1) 1979
$ 18,435
--   1980
7,970
$ 1,195.50
After concessions, the sole issue for decision is whether a closing agreement between petitioner and respondent regarding the tax treatment of a limited partnership investment precluded respondent from disallowing certain loss deductions claimed by petitioner on his 1979 and 1980 income tax returns. FINDINGS OF FACT David Nadler (petitioner) was a resident of New York, New York, at the time he filed his petition. Petitioner is an attorney specializing in real estate law. Petitioner has been licensed to practice law in New York State since 1966. In 1977, petitioner acquired 4.44 units of a limited partnership interest in Milton Cable Associates for $ 40,000 in cash. The Milton partnership agreement purportedly made each limited partner personally liable on an *406 "equipment note" to the extent of $ 17,678.57 per unit. The maximum amount of petitioner's liability under this clause was approximately $ 78,500. Petitioner claimed the following investment tax credits and deductions for his distributive share of losses incurred by Milton: Year
Deduction
Credit
1977
$ 15,600
$ 1,131.00
1978
43,282
198.00
1979
31,312
344.20
1980
8,483
309.40
Respondent subsequently examined petitioner's entitlement to these deductions and credits. In June 1985, [1] petitioner and respondent entered into a closing agreement regarding the Milton partnership that dealt conclusively with certain tax issues related to the partnership. In the discussions between petitioner and respondent's representatives that led to respondent's preparation of the agreement, petitioner expressed concerns about "phantom income". Respondent's appeals officer prepared the agreement on Form 906. The operative part of the agreement reads in its entirety: NOW IT IS HEREBY DETERMINED AND AGREED for Federal income tax purposes: (1) That the taxpayer is entitled to ordinary deduction from taxable income in the amount of $ 15,600.00 for the taxable *407 year ended December 31, 1977 and an ordinary deduction from taxable income in the amount of $ 24,400.00 for the taxable year ended December 31, 1978, said deduction being the equal [sic] to the cash paid by the taxpayer. (2) That taxpayer is not entitled to investment credit with respect to his interest in Milton Cable Associates partnership for any taxable year. (3) That taxpayer has an adjusted basis of zero as of December 31, 1978 for his partnership interest in Milton Cable Associates. (4) That taxpayer is not entitled to any increase in the basis of his partnership interest as a result of any nonrecourse obligation until such time and only to the extent that the nonrecourse obligation is paid by making cash payments on the nonrecourse obligation. (5) That the discharge, forgiveness or any disposition of the partnership nonrecourse obligation in any tax year subsequent to December 31, 1978 will not result in gross income to the taxpayer(s), except that losses deducted by the taxpayer(s) in excess of the cash paid by the taxpayer(s) and which were not disallowed by the Internal Revenue Service are to be includable as ordinary income by the taxpayer(s) in the year in which the *408 nonrecourse obligation is cancelled, forgiven or otherwise disposed of. When petitioner signed the agreement, he did not understand paragraph 3. He did not ask respondent's appeals officer what it meant. Prior to signing the agreement, he did not consult with anyone knowledgeable in tax law or procedure. At the time he signed the agreement, petitioner had the impression that paragraph 5 addressed his concerns about phantom income. Following execution and delivery of the closing agreement, respondent issued several notices of proposed deficiency ("30-day letters") to petitioner, proposing to disallow the deductions petitioner had claimed for 1979 and 1980 with respect to petitioner's interests in the partnership. Petitioner wrote respondent letters in October 1986, November 1986, December 1986, and April 1987. Petitioner wrote these letters himself, apparently without the help of a tax adviser. In each letter, petitioner asserted that paragraph *409 5 of the closing agreement prohibited the disallowance of deductions in 1979 and 1980. Respondent's replies were the two statutory notices of deficiency in this case, issued in May 1990. OPINION Closing agreements are statutory agreements, authorized by section 7121.[2] They are employed to define conclusively the tax treatment of an item or a taxpayer's liability for specific tax years. Saltzman, IRS Practice and Procedure, par. 9.09[2], at 9-66 (2d ed. 1991). Agreements utilizing Form 906 define conclusively the tax treatment of an item, see Estate of Magarian v. Commissioner, 97 T.C. 1, 5 (1991); Zaentz v. Commissioner, 90 T.C. 753, 760-761 (1988), such as the basis of an investment as of a specified date in the past. Saltzman, IRS Practice and Procedure, par. 9.09[2], at 9-65, 9-66. Both the taxpayer and the Service are bound by the terms of the closing agreement, absent a showing of fraud, malfeasance, or misrepresentation of a material fact. Sec. 7121(b). A court may not disregard or modify the agreement without such a showing. Sec. 7121(b)(2). Petitioner does not contend that any of the conditions of section 7121(b) that would *410 permit the closing agreement to be disregarded have been satisfied. Petitioner agreed under paragraph 3 of the closing agreement that he had an adjusted basis of zero in his partnership interest in Milton as of the end of 1978. Partners are not allowed deductions for their distributive shares of partnership losses in any amount greater than their basis. Sec. 704(d). Therefore, in order to be entitled to the deductions claimed on the 1979 and 1980 returns, petitioner must show that something caused his adjusted basis in his partnership interest to become greater than zero after December 31, 1978. Petitioner has the burden of proof on this issue. Rule 142(a). Petitioner offered no proof that anything happened during 1979 or 1980 to increase the adjusted basis of his interest in the partnership. Therefore, petitioner is not entitled to the claimed *411 deductions. Petitioner asserts that the basis of his partnership interest was greater than zero because of the equipment note. He claims that his liability on the equipment note was recourse and that he was at risk for the entire $ 78,500, thus entitling him to deduct the loss pass-throughs. Petitioner's interpretation of the effect of the note is inconsistent with the terms of the closing agreement. Petitioner agreed in the closing agreement that he had a zero adjusted basis in his Milton investment as of December 31, 1978. We therefore do not see how an obligation he had incurred in 1977, prior to the execution of the closing agreement, could have entitled him to a positive basis in 1979 and 1980. Whatever petitioner's original basis in the partnership might have been, taking account of the equipment note, the closing agreement wiped out any and all such basis; he cannot now resurrect it. Estate of Johnson v. Commissioner, 88 T.C. 225, 232-233 (1987), affd. without published opinion 838 F.2d 1202 (2d Cir. 1987). We need not consider whether the equipment note was recourse or nonrecourse. [3] In either case and in any event, petitioner was *412 not entitled to include any part of the principal amount of the note in the basis of his partnership interest at the end of 1978. He therefore had no basis in his partnership interest in 1979 and 1980 that would support a loss pass-through from the partnership. *413 Petitioner argues that paragraph 5 of the closing agreement guaranteed that he would be able to deduct the 1979 and 1980 losses. Petitioner claims that the paragraph "clearly looks to losses which were not specifically addressed in the Closing Agreement." Petitioner's interpretation of paragraph 5 is that petitioner was entitled to deduct the 1979 and 1980 losses, but would be required to include the amount of the losses as "phantom income" [4] in the "burnout" year, i.e., the year that the equipment note will be forgiven or canceled. Petitioner focuses *414 on the word "were" in the exception clause to paragraph 5. The clause talks about deductions that "were not disallowed". The 1979 and 1980 deductions were not disallowed by the closing agreement. Petitioner's interpretation is that if the deductions were not disallowed as of the time of the signing of the agreement, they were allowed by the agreement, subject to their inclusion in income when burnout should occur. To the extent that the closing agreement is ambiguous on the point, petitioner urges us to interpret the agreement in his favor under general principles of contract law that resolve ambiguities against the drafter of an agreement. We disagree with petitioner's analysis. Even allowing for the ambiguity petitioner claims, the agreement falls short of allowing the 1979 and 1980 deductions. The proper focus is on the phrase "not disallowed". In tax parlance, "not disallowed" does not mean "allowed". "Allowed", when it appears in a closing agreement, means that no action may ever be taken to disallow the deductions. It has the same meaning as "entitled to" in paragraph 1 of the closing agreement. "Not disallowed" means no action has yet been taken to disallow the deduction. *415 It does not mean that no action may ever be taken. Therefore, it is immaterial that the deductions had not yet been disallowed as of the time of the closing agreement. Interpreted most charitably in petitioner's favor, the closing agreement says only that the deductions in issue were not disallowed by the closing agreement itself, leaving open the possibility that they might be disallowed in the future. The agreement was silent about whether the 1979 and 1980 deductions would be allowed. [5] When a Form 906 closing agreement (such as the one petitioner signed) is silent on an issue, the issue is unresolved and open to determination. Estate of Magarian v. Commissioner, supra at 6 (additions to tax upheld when closing agreement silent on point); Zaentz v. Commissioner, supra at 761 (closing agreements silent on whether trusts were valid and not grantor trusts; respondent sustained). Thus, the allowability of the claimed deductions was subject to determination by respondent. Far from enabling petitioner to win his case, the closing agreement sealed his fate by creating the condition requiring our determination that petitioner is not *416 entitled to the deductions he claimed for the later years. Petitioner further argues that paragraph 5 says that respondent may include the amount of petitioner's claimed deductions in his gross income only when the obligation is canceled, forgiven, or otherwise disposed of. Inasmuch as none of those events happened in 1979 or 1980, petitioner argues that respondent may not force him to "recapture" these deductions in these earlier years. Once again, it seems that petitioner either does not or will not understand the vocabulary of tax law. The current allowability of a deduction is a different issue from whether that deduction must be recaptured on the later disposition of a property interest. The language to which petitioner refers deals only with the recapture issue, and does so in respondent's favor. On disposition, petitioner will be required *417 to recapture any deductions claimed that have not been disallowed prior to the disposition. Paragraph 5 does not address the allowability of any deduction. Petitioner would have us read into the agreement terms specifically allowing the disputed deductions, similar to paragraph 1's partial allowance of the 1977 and 1978 deductions. The existence of an ambiguity does not license us to add new terms to the agreement. Section 7121(b)(2) prohibits us from modifying a closing agreement absent a showing of fraud, malfeasance, or misrepresentation, none of which have been shown in this case; indeed, petitioner steadfastly denies that he seeks reformation of the agreement. If the parties intended such a paragraph to be part of their agreement, they easily could have included it. In this regard, we find it highly significant that petitioner, an experienced real estate attorney, signed an agreement he did not understand and did not obtain the advice of anyone familiar with tax law or procedure before signing it. Petitioner also urges us to find that, after the closing agreement, respondent acquiesced in petitioner's interpretation of the agreement, and that respondent's acquiescence shows *418 petitioner's interpretation to be correct. Petitioner relies on the four letters he sent respondent, asserting and reiterating his interpretation of paragraph 5. Petitioner cites Viacom International, Inc. v. Lorimar Productions, 486 F. Supp. 95 (S.D.N.Y. 1980), and Ottley v. Palm Tree Nursing Home, 493 F. Supp. 910 (S.D.N.Y. 1980), for the proposition that the parties' actions in carrying out a contract are highly probative evidence of the meaning of the contract. Both cases applied this rule when a party had performed some action under the contract contrary to that party's litigation position, such as treating a television production as a "movie" and then claiming in the litigation that the contract required treating the production as a "mini-series". Viacom International, Inc. v. Lorimar Productions, supra.Respondent's failure to respond to petitioner's letters was not inconsistent with respondent's present litigation position, so the cases petitioner cites do not apply. Petitioner essentially argues that respondent is equitably estopped to deny the correctness of petitioner's interpretation. We apply equitable *419 estoppel against respondent "with the utmost caution and restraint." Estate of Carberry v. Commissioner, 933 F.2d 1124, 1127 (2d Cir. 1991) (quoting Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987)), affg. 95 T.C. 65 (1990). At a minimum, a taxpayer must rely to his detriment upon the Commissioner's actions (or in this case, inaction). Estate of Carberry v. Commissioner, supra at 1127; Boulez v. Commissioner, supra at 215. Estoppel may be successfully invoked against the Commissioner only when a person might sustain such a profound and unconscionable injury in reliance on the Commissioner's action as to require, in accordance with any sense of justice and fair play, that the Commissioner not be allowed to inflict the injury. It is to be emphasized that such situations must necessarily be rare, for the policy in favor of an efficient collection of the public revenue outweighs the policy of the estoppel doctrine in its usual and customary context. * * * [Schuster v. Commissioner, 312 F.2d 311, 317 (9th Cir. 1962), *420 affg. 32 T.C. 998 (1959) and revg. First Western Bank & Trust Co. v. Commissioner, 32 T.C. 1017 (1959).] Petitioner did not prove that he did anything in reliance on respondent's inaction, that he did so to his detriment, or even that there was anything about respondent's silence upon which a reasonable taxpayer could rely. Petitioner is not entitled to invoke equitable estoppel. To reflect the foregoing and concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. Petitioner has conceded the statute of limitations as a defense.↩
2. All section references are to the Internal Revenue Code as in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice & Procedure.↩
3. It appears that the parties had agreed to treat the note as nonrecourse. Paragraph 5 refers to "the partnership nonrecourse obligation". The only obligation which appears on the record is the equipment note. The description of the equipment note in paragraph 5 as nonrecourse indicates that the parties treated the note as nonrecourse. This conclusion is bolstered by the fact that the agreement limited petitioner to deductions of $ 40,000, the amount of cash he paid into the partnership. By agreeing that his deductions were limited to his cash investment until and to the extent that petitioner made cash payments on the obligation, petitioner necessarily agreed that the equipment note would not affect his ability to claim deductions. Although the premises upon which a closing agreement is based are not a part of the agreement, the premises may be used to determine what the parties agreed to. Estate of Magarian v. Commissioner, 97 T.C. 1, 5-6 (1991); Zaentz v. Commissioner, 90 T.C. 753, 764↩ (1988). If we were required to determine whether the parties agreed to treat the equipment note as nonrecourse, we would rely on these inferences to find that they had so agreed.
4. Phantom income or gain is: a reference to gains which are not realized in cash. The most common example occurs when property which is encumbered by nonrecourse debt is transferred to the lender by means of a deed in lieu of foreclosure. The excess of the debt over the property's adjusted basis is taxable (phantom) gain under section 1001(a). See Comm'r v. Tufts, 461 U.S. 300↩ (1983). [Westin, The Tax Lexicon 413 (1989); emphasis omitted.]
5. The implication of paragraph 3, which gives petitioner a zero basis in his partnership interest as of the end of 1978, is that the deductions would be disallowed.↩