BIRNBAUM and MANAKER, P.C., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Birnbaum & Manaker, P.C. v. Commissioner
Docket No. 14017-91
United States Tax Court
T.C. Memo 1993-485; 1993 Tax Ct. Memo LEXIS 495; 66 T.C.M. (CCH) 1087; October 20, 1993, Filed *495 Decision will be entered for respondent. For petitioner: John F. Sutphen and Carter H. Strickland. For respondent: Anne Melzer and Gary P. Bluestein. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined a deficiency in petitioner's Federal income tax as follows: Fiscal Year Ended
Deficiency
February 28, 1986
$ 93,030
The issues for decision are: (1) Whether respondent is equitably estopped from denying petitioner a loss carryforward deduction; (2) whether petitioner is entitled to an embezzlement loss of $ 252,349 for fiscal year ended February 28, 1986; and, alternatively, (3) whether petitioner is entitled to a bad debt deduction of $ 252,349 under section 166[1] for fiscal year ended February 28, 1986. We hold that respondent is not equitably estopped and that petitioner is not entitled to an embezzlement loss or bad debt deduction. *496 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the attached exhibits, is incorporated herein by this reference. Birnbaum and Manaker (herein petitioner or firm) is a professional corporation organized and existing under the laws of the State of New York. During the taxable year at issue, petitioner's principal place of business was in Syracuse, New York. Irwin Birnbaum and Ralph Manaker were licensed to practice law in the State of New York. Birnbaum was the primary litigator, principal shareholder, and president of the firm; Manaker prepared the cases for trial, assisted Birnbaum with the cases, and served as secretary and treasurer of the firm. Most of the firm's clients were seriously injured infants or brain-damaged adults who were catastrophically injured. Donald Aquilio, Esq. (Aquilio) was hired on October 6, 1978. On that day, Aquilio entered into the Incentive Bonus Program wherein he was awarded a bonus based on a percent of net revenues. At the time he joined the firm, and all material times thereafter, Aquilio was a member of the New York State Bar and a certified public accountant licensed in New York State. *497 In 1981, the law firm's name was changed to Birnbaum, Manaker and Aquilio, P.C. In March 1981, Aquilio entered into the Restricted Stock Agreement (RSA), effectively nullifying his interest in the Incentive Bonus Program. RSA provided that Aquilio had the right to purchase, at a purchase price of $ 20 per share, common stock in the firm as follows: Effective date
Percentage of stock of right
to which right Applies
3/01/81
20 percent
2/28/82
27 percent
2/28/83
33 percent
The agreement provided that if Aquilio left the firm "prior to February 28, 1986, the shares acquired under this Agreement shall be returned to the firm and Aquilio shall receive as payment "an amount equal to twenty dollars ($ 20) times the number of shares forfeited." As of March 1, 1982, Aquilio had purchased 27 percent of the outstanding shares of petitioner's law firm pursuant to the RSA. Aquilio's field of specialty was taxation. Prior to March 1983, Aquilio was elected treasurer of the law firm, a position he maintained until his employment was suspended in February 1985. As a part of his professional duties, Aquilio was in charge of the firm's tax practice matters. Additionally, Aquilio *498 kept the internal books and records of the firm and handled all the firm's finances. He was authorized to make withdrawals from the corporate accounts and to sign corporate checks in any amount without the requirement of a second signature. During 1981, 1982, and 1983, Aquilio invested the firm's funds, the clients' funds, as well as Birnbaum's and Manaker's personal funds, in cattle tax shelters called BMS Livestock & Cattle Co. 1981, 1982, and 1983, respectively (herein BMS). BMS was a client of the firm and dealt primarily with Aquilio. Aquilio purchased and sold the cattle through an organization in Denver called CSC. Each shelter was designed to generate an initial loss when the cattle and feed were purchased, and a gain when the cattle were sold. It was intended that gains generated by the sale of the cattle in year two would be reinvested into a new herd of cattle for the next year's BMS company so that an offsetting loss would be generated. Thus, the gains generated by the sale of cattle of BMS 1981 were reinvested into BMS 1982, and so on. BMS 1981 and 1982 made a profit. However, by the end of 1983, BMS 1983 was losing money. Merchants National Bank & Trust Company *499 (Merchants), the primary bank of the firm, provided lines of credit primarily to prosecute litigation. Generally, clients did not have the funds to litigate a medical malpractice case. Merchants loaned money to the firm, which loaned the money to clients to pay the expenses associated with litigation. On January 9, 1985, Messrs. Birnbaum and Manaker discovered that the Merchant's account was overdrawn, the firm's savings account was emptied, the firm's line-of-credit was overdrawn, and funds from the clients' trust accounts were overdrawn. In total, the firm was overdrawn by $ 300,000 to $ 400,000. The next day, Aquilio was hospitalized as a result of an attempted suicide. Following Aquilio's hospitalization, petitioner caused an audit of its books and records to be performed. In a letter dated January 21, 1985, Birnbaum notified Aquilio that, until further notice, he could not represent clients of Birnbaum, Manaker & Aquilio, P.C. or use the firm's facilities. In February 1985, by decision of the board of directors, Aquilio was removed as an officer of the law firm. Thereafter, Manaker requisitioned records from Merchants and discovered hundreds of thousands of dollars transferred *500 on a daily basis between a commodity company called Heinhold in Chicago, the firm, and BMS; between the firm, Aquilio, Aquilio's wife Daria Vance, and an account titled Vance Trust. (Aquilio served as trustee to the Vance family trust). The firm hired an accounting firm to audit its books and records, including the records of BMS. As of February 1985, the firm had no assets and a tremendous amount of debt. BMS had nothing. BMS had purchased and sold cows in 1983; however, after that year, BMS neither purchased nor sold cattle. Instead, BMS, under the direct management of Aquilio and in his name personally, traded on the commodity exchange and lost. Aquilio had also "borrowed" $ 200,000 from the Vance Trust as collateral. Merchants Bank filed an action against the firm. The firm settled with Merchants for approximately $ 500,000 on April 15, 1987. (Manaker and Birnbaum borrowed the $ 500,000 from Manufacturers Hanover Trust Company to pay Merchants Bank). The claims represented funds borrowed by Aquilio on behalf of the firm and two loans made to either the corporation or to Manaker and Birnbaum personally for approximately $ 160,000 each. Vance Trust commenced litigation *501 against the firm for the $ 200,000 illegally withdrawn; judgment was entered against Aquilio for that amount. Manaker and Birnbaum reimbursed the clients' trust accounts from their personal funds. During the months of March and April 1985, Birnbaum and Manaker verbally reported Aquilio's alleged embezzlement to the Federal Bureau of Investigation (FBI), the local District Attorney's Office (DA), the New York State Bar Association (NYSBA), and the Association of New York Certified Public Accountants (AICPA). Aquilio was precluded from the practice of law until the conclusion of the ethics proceedings in the fall of 1990, except for family matters. The DA declined to prosecute Aquilio for embezzlement. After hearing the evidence presented by the Department of Justice, a Federal grand jury did not indict Aquilio for any crime related to the alleged embezzlement. Aquilio was not disbarred nor suspended by the NYSBA. Instead, he was censured "in light of the stress respondent [Aquilio] was under at the time of these incidents due to the collapse of an investment partnership he managed, as well as disintegration of the law firm in which he was managing partner." During 1983 through *502 1985, it was ordinary practice for petitioner's board of directors to meet at the beginning of each fiscal year and agree in advance upon the officers' salaries for the coming year. Petitioner maintained individual loan accounts for each officer. During the fiscal year, the officers' cash withdrawals, for whatever purpose, would be charged against their loan accounts, thereby increasing the outstanding balance. At the end of the fiscal year, each officer's loan account was reduced by the amount of the officer's salary previously agreed upon at the beginning of the taxable year. Moreover, the remaining balance of each officer's individual loan account, if any, was treated as the officer's bonus. For fiscal years ending February 28, 1983, to February 28, 1986, the amounts reported by petitioner as compensation paid to Birnbaum and Manaker ranged from approximately $ 135,000 to $ 350,000, while Aquilio's compensation ranged only from $ 0 to $ 250,000. [2]
*503 On its tax return for fiscal year ending February 28, 1986, petitioner did not deduct any salary or compensation for Aquilio; instead petitioner claimed a deduction for an embezzlement loss in the amount of $ 658,815. On or about December 1985, the firm's name was changed back to Birnbaum and Manaker, P.C. However, the professional corporation of Birnbaum, Manaker and Aquilio, P.C. was never formally liquidated. On or about December 30, 1985, a "Summons and Complaint" on behalf of petitioner was served on Aquilio. As of February 28, 1986, the only judgment entered and docketed against Aquilio was a judgment filed by Merchants in April 1985. The numerous law suits filed by the firm against Aquilio in State court were still pending at the time this case was tried. Revenue Agent David Navin (Navin) was assigned the audit of petitioner's 1984, 1985, and 1986 returns. The 1986 audit commenced prior to the closing of the prior years' audit. One of Navin's suggested audit changes for the 1984-1985 year audit was the disallowance or recharacterization of the alleged embezzlement loss. On his workpapers, Navin attributed $ 373,209 of the $ 658,815 to Aquilio. [3] The residual was *504 divided between Birnbaum and Manaker as adjustments to their loan accounts. From the amount attributed to Aquilio, Navin allowed for a pre-approved salary payment in 1985 of $ 125,000. The balance of $ 252,349, [4] the subject of contention, was deemed "the balance of the loan outstanding - ? (B/D writeoff) - Not determined to be uncollectible until FY 8602-1120." *505 OPINION Estoppel Issue
Petitioner asserts that respondent should be estopped from denying that a $ 252,349 bona fide business debt was created between Aquilio as debtor and petitioner as creditor during the fiscal year ended February 28, 1986, since petitioner relied upon the workpapers of Navin. It is firmly established that estoppel should be applied against the Government with utmost caution and restraint. Estate of Carberry v. Commissioner, 933 F.2d 1124 (2d Cir. 1991), affg. 95 T.C. 65 (1990); Schuster v. Commissioner, 312 F.2d 311, 317 (9th Cir. 1962), affg. 32 T.C. 998 (1959) and revg. First Western Bank & Trust Co. v. Commissioner, 32 T.C. 1017 (1959). Petitioner contends that Navin misrepresented that the $ 658,815 embezzlement loss deduction claimed would be reclassified in part as compensation to officers and in part as loans due petitioner by its officers, specifically, that the $ 252,349 amount be classified as a loan due petitioner by Aquilio. Petitioner relies on notations in Navin's workpapers to substantiate *506 its claim. In referring to the $ 252,349 amount, the notations state "the balance of the loan outstanding - ? (B/D writeoff) - Not determined to be uncollectible until FY 8602-1120." It is well settled that reports of revenue agents, even though they form the basis for the respondent's notice of deficiency, are not competent proof of the facts stated therein, in the absence of an agreement to that effect. Blanco v. Commissioner, 56 T.C. 512, 515 (1971); Fitzner v. Commissioner, 31 T.C. 1252, 1255 (1959); Blundon v. Commissioner, 32 B.T.A. 285 (1935). When the Commissioner is involved, if any of the following elements is missing, the doctrine of equitable estoppel cannot be invoked: (1) There must be a false representation or wrongful misleading silence; (2) the error must be in a statement of fact and not in an opinion or a statement of law; (3) the person claiming the benefits of estoppel must be ignorant of the true facts; and (4) he must be adversely affected by the acts or statements of the person against whom an estoppel is claimed. * * *
Estate of Emerson v. Commissioner, 67 T.C. 612, 617-618 (1977). *507 See also Tonkonogy v. United States, 417 F.Supp. 78, 79 (S.D.N.Y. 1976) (enumerating the essential elements of equitable estoppel with respect to the Commissioner). Navin's notes do not reflect either a false representation or a wrongful silence. Petitioner and Navin did not enter into a separate written agreement apart from the workpapers, nor is there evidence that an oral agreement between the parties was made. Moreover, the error, if any, was based upon Navin's opinion or a statement of law, not a pure statement of fact. Clearly, the evidence presented in this case does not show the requisite enumerated elements to estop respondent. Accordingly, respondent is not estopped from claiming that the $ 252,349 was not a bona fide business debt. Characterization of Loss
Petitioner contends that it suffered an embezzlement (theft) loss under section 165 and is entitled to a deduction. [5]Deductions are strictly a matter of legislative grace, and petitioner bears the burden of proving it is entitled to any deductions claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). *508 Embezzlement is defined in the State of New York as the intentional misappropriation of money or property of another by one who has possession as a bailee, agent, or custodian of the owner, and is a form of larceny. People v. Chesler, 71 A.D.2d 792, 793, 418 N.Y.S.2d 962 (1979), affd. 50 N.Y.2d 203, 406 N.E.2d 455 (1980). [6] Conversion is an essential element of larceny by embezzlement. People v. Calandra, 459 N.Y.S.2d 549 (Sup. Ct. 1983). A classic example of this crime is the taking of funds from an employer by a trusted employee. Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795 (1974), affd. 521 F.2d 786 (4th Cir. 1975). *509 Officers of a corporation stand in a fiduciary relationship to the corporation and owe the corporation their individual loyalty, and are not permitted to derive a personal profit at the expense of the corporation. See, e.g., Fender v. Prescott, 101 A.D.2d 418, 476 N.Y.S.2d 128 (1984), affd. 64 N.Y.2d 1077 (1985); Schachter v. Kulik, 96 A.D.2d 1038, 479 N.E.2d 444 (1983). Such a taking for personal inurement would clearly exemplify a section 165 loss. In our case, petitioner accuses Aquilio of breaching his fiduciary duty to the firm by misappropriating the clients' trust account funds and the firm's funds for his personal advantage. See, e.g., Colella v. Commissioner, T.C. Memo. 1993-375. The [Missing Page] Prior to discovery of the missing funds, Aquilio was authorized to make withdrawals from the corporate accounts and to sign corporate checks in any amount without the requirement of a second signature. Further, Aquilio was authorized to make investments on behalf of the firm, as well as with Manaker's and Birnbaum's personal *510 funds. [7] The record is clear that petitioner was fully aware of Aquilio's investment in BMS. However, the record fails to disclose any formal meetings of the officers and/or the board wherein they discussed and authorized the nature and amounts of Aquilio's investments. The record also reflects that it was the ordinary practice of the firm to allow each of its partners to make cash withdrawals which were charged against his individual loan account during the year. At yearend, this account was "trued-up" to reflect the partner's predetermined salary, and if there was a balance thereafter, a yearend bonus to cover the balance was deemed to be awarded the partner. During the year in issue, Aquilio withdrew hundreds of thousands of dollars of the firm's and its clients' funds for investment purposes. He was able to do so because the firm had failed to establish an understanding or institute *511 a maximum level or dollar amount that could be withdrawn during a given period. [8]
Nevertheless, we do not believe it was ever contemplated that the clients' trust funds and the Vance Trust would be invaded, or that the firm's bank accounts would be emptied and its line-of-credit overdrawn. With or without corporate resolutions, the firm had a right to expect Aquilio to act within the bounds of legal ethics and his fiduciary duty, and to advise the other partners if such drastic measures proved necessary. We believe Aquilio exceeded the limits of any expressed or implied authority. Nonetheless, petitioner has not shown that Aquilio intended to appropriate the money for himself. Instead, he may have been desperately trying to cover losses from bad investments, in the hope that he could reverse the losses and replace the money owed to the firm, its clients, *512 and his partners. See Gilbert v. Commissioner, 552 F.2d 478 (2d Cir. 1977), revg. T.C. Memo. 1976-104. Petitioner's experience with the organizations listed below illustrates the ambiguities here involved. Prior to bringing this suit in the Tax Court, petitioner reported its claims against Aquilio with the NYSBA, DA, FBI, and the AICPA. The NYSBA's Office of Grievance Committees for the Fourth Judicial Department stated in its findings that: We determine that the evidence presented on the first charge supports a finding of commingling, but not conversion. * * * We also determine that the evidence submitted on the second charge does not support a finding of misconduct. * * * The proof was insufficient to support a determination that respondent [Aquilio] intended to benefit himself by this transfer of funds from disbursement account to the general operating account.
Thus, the conclusion of the NYSBA was to merely censure or reprimand Aquilio for his actions. It declined to suspend or disbar him. Likewise, the FBI, DA, and AICPA declined to prosecute or suspend Aquilio for the alleged embezzlement loss. After *513 reviewing all the evidence in this case and the conclusions of the agencies enumerated above, we conclude that petitioner has not established that Aquilio possessed the requisite intent to deprive the firm of the funds, or to appropriate the funds to himself or to a third person which would tend to show embezzlement. See N.Y. Penal Law sec. 155.05 (West 1988); see also Gilbert v. Commissioner, supra at 480-481. Consequently, we sustain respondent's findings that no embezzlement loss is allowable under section 165. Bad Debt Deduction
Next, petitioner contends that even if the Court finds that the loss is not due to an embezzlement, it is nonetheless entitled to deduct the debt in the year in question under section 166 as a bad debt. Section 166(a) provides as a general rule that a deduction shall be allowed for any debt which becomes worthless within the taxable year. [9]
*514 Only a bona fide debt qualifies for deduction under section 166. A bona fide debt is defined as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed and determinable sum of money." Sec. 1.166-1(c), Income Tax Regs.
Whether a bona fide debtor-creditor relationship exists is a question of fact to be determined upon consideration of all the pertinent facts in the case. Haber v. Commissioner, 422 F.2d 198 (5th Cir. 1970), affg. 52 T.C. 255 (1969); Fisher v. Commissioner, 54 T.C. 905, 909 (1970). Courts have enumerated various factors to be considered in making such a determination. See, e.g., Haber v. Commissioner, supra.Although no single factor is controlling, the ultimate question is whether there was a genuine intention to create a debt with a reasonable expectation of repayment, and whether that intention comports with the economic reality of creating a debtor-creditor relationship. Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 494 (1980); Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973). *515 Petitioner contends that a debtor-creditor relationship in fact existed between the firm and Aquilio because (1) Aquilio's loan account constituted a bona fide debt due and owing the firm, and (2) the loan account constituted a debt created in the course of petitioner's trade or business. Petitioner maintained individual loan accounts for each officer. These accounts represent a valid debt between the partnership and the individual partner. The officers' cash withdrawals, for whatever purpose, were charged against their loan accounts, thereby increasing the outstanding balance owed to the firm. Although petitioner later claimed this amount as an embezzlement deduction on its tax return, when Aquilio initially withdrew the funds from the firm's account, we find that a genuine intention to create a debt existed. Moreover, based upon past practices of the firm with regard to the officers' loan accounts, the withdrawal was a valid obligation to pay a fixed and determinable sum of money. Therefore, we find that a bona fide debtor-creditor relationship existed between petitioner and Aquilio. Having found the debt to be bona fide, we now consider whether the debt became worthless *516 during fiscal year ended February 28, 1986. In determining whether a debt is worthless, consideration must be accorded to all pertinent evidence, including the value of collateral, if any, securing the debt and the financial condition of the debtor. Sec. 1.166-2(a), Income Tax Regs. Moreover, where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for the purposes of the deduction under section 166. Sec. 1.166-2(b), Income Tax Regs. Finally, the debt must become worthless within the taxable year for which it is claimed as a deduction. On September 11, 1986, a judgment was rendered against Aquilio in family court in New York State for child support arrears from April 20, 1985 to June 17, 1986 in the amount of $ 27,500. Aquilio was unable to, and in fact did not, pay $ 150 per week for each of his three children. Further, on July 28, 1986, a judgment was entered by the State of New York against Aquilio in regard to the Vance Trust in the *517 amount of $ 212,597. As of fiscal year ended February 28, 1986, Aquilio's outstanding balance owed to the Vance Trust was $ 200,000. Moreover, due to the investigations by the FBI, NYSBA, and DA lodged by petitioner, Aquilio was unable to work, and, in fact, did not work from January 10, 1985, until sometime in 1988. Petitioner was well aware of Aquilio's financial situation. At trial, Birnbaum and Manaker testified that Aquilio was unable to repay the debt due to the judgments against him as well as his inability to make a living. Nonetheless, petitioner has vigorously pursued claims against the Merchant Bank, Demo Stathis, the former accountant, and its insurance company with regard to this matter. This effort resulted in recovery of $ 50,000 from the fidelity insurance carrier on or about May 19, 1986, and $ 67,500 from the former accountant on or about September 29, 1988. To date, other prospects of monetary recovery are pending, including Aquilio's State court action against petitioner. Aquilio alleges in that suit that petitioner owes him 27 percent of the firm's net worth since the board of directors failed to "properly" discharge him prior to the February 1986 deadline *518 as outlined in the RSA. Thus, the amount claimed by Aquilio in his lawsuit, if he were successful, might be applied to substantially offset or eradicate the $ 252,349 amount petitioner seeks to deduct as a bad debt. We do not know the facts with respect to the merits of that proceeding, and express no opinion thereon, nor do we hazard a guess as to its eventual outcome. However, this uncertainty due to the State court's proceeding is fatal to petitioner's claim of worthlessness. Barbour v. Commissioner, 29 T.C. 1039 (1958). The $ 252,349 debt which petitioner seeks to claim as a bad debt is one resulting from a "balancing out of debits and credits" between Aquilio and the firm. See Id. Consequently, until the State proceeding is settled, we cannot say that the debt is in fact worthless. Thus, petitioner has failed to establish that the debt, although bona fide, became worthless during fiscal year ended February 28, 1986. Accordingly, we conclude that petitioner is not able to claim the $ 252,349 as a bad debt deduction under section 166 in fiscal year ended February 28, 1986. To reflect the foregoing, Decision will be entered for respondent *519 . Footnotes
1. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. For fiscal year ended February 28, 1985, petitioner did not deduct any compensation or salary for Aquilio. The record is devoid of any explanation for this omission.↩
3. Of the $ 658,815 initially claimed as loss on petitioner's tax return for fiscal year ended February 28, 1986, all but $ 252,349 is stipulated by the parties to be amounts other than bad debts or an embezzlement loss.↩
4. Of the $ 658,815 claimed as a deduction for an embezzlement loss, $ 373,209 was attributed by Navin to Aquilio. However, the difference between $ 373,209 and $ 125,000 (attributed to Aquilio's salary) does not equal the balance of $ 252,349. The difference -- $ 4,140 -- was described by Navin in his workpapers as "Adjustments to Loan A/Cs (Non-Interest Bearing)".↩
5. Sec. 165 states, in pertinent part: (a) General Rule. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (e) Theft Losses. -- For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.↩
6. N.Y. Penal Law sec. 155.05 (West 1988), defines larceny as 1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof. 2. Larceny includes a wrongful taking, obtaining or withholding of another's property, with intent prescribed in subdivision one of this section, committed in any of the following ways: (a) By conduct heretofore defined or known as common law larceny by trespassory taking, common law larceny by trick, embezzlement, or obtaining property by false pretenses;↩
7. Although Birnbaum testified that Aquilio never made investments on his behalf, his tax returns clearly reflect such investments. ↩
8. Aquilio testified that in prior years, partners had overdrawn their account, but nothing was put in writing to limit a partner's draws to a specified amount.↩
9. Sec. 166 provides, in pertinent part: (a) General Rule. -- (1) Wholly worthless debts. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. -- When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in any amount not in excess of the part charged off within the taxable year, as a deduction.↩